**In re AMERICAN BANK NOTE HOLOGRAPHICS, INC. SECURITIES LITIGATION.**

**In re American Banknote Corporation Securities Litigation.**

**Nos. 99 Civ. 0412 CM, 99 Civ. 0661 CM.**

United States District Court,
S.D. New York.

April 6, 2000.

---

MEMORANDUM ORDER AND DECISION GRANTING DEFENDANT ABN'S MOTION TO DISMISS PLAINTIFFS' CLAIM UNDER SECTION 11 OF THE 1933 SECURITIES ACT AND DENYING ALL OTHER MOTIONS TO DISMISS.

McMAHON, District Judge.

Two putative plaintiff classes bring these consolidated actions against American Banknote Corporation ("ABN"), American Bank Note Holographics, Inc. ("Holographics"), their auditors, the underwriters of Holographics' public offering, and several former officers of both corporations, for claims arising under Sections 11, 12(a) and 15 of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77(k), 77(*l*) and 77(*o*); and Section 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a), and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission ("SEC"), 17 C.F.R. § 240.10b–5. Defendants Holographics, ABN, the Underwriters and individual defendants Weissman and Macchiarulo, move separately to dismiss all claims against them in the consolidated Holographics' Complaints pursuant to Rules 9(b) and 12(b)(6) of the Federal Rules of Civil Procedure, and the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. § 78u–4.[1] ABN and individual defendants Weissman, Gentile and Gorman move to dismiss the ABN Complaint pursuant to Rules 9(b), 12(b)(6) and the PSLRA.

For the reasons stated below, Plaintiffs' claim against ABN under Section 11 of the Securities Act is dismissed. All other motions to dismiss the Holographics Complaint are denied. The motions to dismiss the ABN Complaint are also denied.

---

**1.** Deloitte and Cantor have filed Answers to the Holographics Complaint and have no motions before the Court.

## I. *The Parties*

### A. *Class Plaintiffs*

Plaintiffs in the consolidated action consist of two putative classes. The Holographics Plaintiffs were investors who purchased common stock issued by American Bank Note Holographics in connection with the Company's initial public offering ("IPO") on July 15, 1998, and/or in the open market during the period July 15, 1998 through February 1, 1999. The ABN Plaintiffs were shareholders of ABN who purchased shares in ABN during the period from May 2, 1996 through January 25, 1999.

The Holographics Plaintiffs have moved separately for class certification under Fed.R.Civ.P. 23(a) and 23(b)(3). Prior to imposition of the automatic stay, the Court had received no motion for class certification from the ABN Plaintiffs.

### B. *Defendants*

American Banknote Corporation ("ABN") is a Delaware holding company with subsidiaries in the United States and other countries. It conducts business in diverse fields, including transaction cards, which includes the production of stored value cards and so-called "smart cards"; transaction processing, which involves the servicing of third-party credit, debt, automated teller machines, and electronic benefit transactions, as well as loyalty and university card programs; and security printing, which involves the printing of, among other items, checks, money orders, passports, foreign currency, and stock and bond certificates.

American Bank Note Holographics ("Holographics") was a wholly-owned subsidiary of ABN, whose primary business was, and continues to be, the production of holographic materials for use in security printing. Holographics commenced an initial public offering on or around July 15, 1998. Subsequent to the IPO, ABN and Holographics continued their operations as separate entities.

Morris Weissman was the founder of ABN. He was at all relevant times the Chairman and CEO of both Holographics and ABN, although he resigned from Holographics on April 9, 1999. He continues to serve as Chairman and CEO of ABN. Joshua C. Cantor was at all relevant times President of Holographics. Richard P. Macchiarulo was at all relevant times Vice President of Finance, Chief Financial Officer, and Chief Accounting Officer of Holographics. Patrick J. Gentile was at all relevant times Vice President and Corporate Comptroller of ABN. John T. Gorman has been Executive Vice President and Chief Financial Officer of ABN since 1990.

Deloitte & Touche, LLP ("Deloitte") served as Holographics' independent public accountant prior to, during and subsequent to the IPO, and was retained by the Audit Committee of the Holographics board to investigate the financial improprieties at issue in this suit. Nationsbanc Montgomery Securities, LLC ("Nationsbanc") served as lead underwriter for the Holographics IPO;[2] Lazard Freres, & Co., LLC ("Lazard"), Raymond James & Associates, Inc. ("Raymond James") and Salomon Smith Barney Holdings, Inc. ("Smith Barney") served as co-managers of the IPO (collectively, the "Underwriters").

The two actions here arise out of accounting irregularities in several quarters preceding the IPO that were discovered and disclosed by ABN and Holographics approximately six months after the Holographics IPO.

---

**2.** Nationsbanc Montgomery Securities, LLC is now known as Bank of America Securities, LLC following the merger of its parent corporation, NationsBanc Corp. with BankAmerica Corp. (Underwriters' Mem. at 1).

## II. *The Factual Allegations*

The following factual allegations in the consolidated Complaints are accepted as true for the purposes of this motion.

ABN is a holding company, which through several subsidiaries in the United States, Brazil, Australia and New Zealand, operates in a single industry—secured products and systems. It has three principal product lines: transaction cards and systems; printing services and document management; and security printing solutions. In ABN's Security Printing Solutions Group, the company designs and prints counterfeit-resistant documents, such as checks, passports, visas, birth certificates, Social Security cards, stock and bond certificates and currency.

Until July 1998, Holographics was a wholly owned subsidiary of ABN. During the fiscal years 1996 and 1997 and the first two quarters of 1998 (ending on June 30, 1998), the revenues of Holographics represented approximately 9.5% of ABN's total revenues. Holographics manufactures mass-produced holograms and holographic material for use in security and counterfeiting-protection applications, such as credit cards, and for non-secure uses such as magazine advertisements and specialized packaging.

In 1996 and 1997, ABN was highly leveraged, and was looking to expanding its foreign presence to grow sales. To fuel its growth and pay for overseas acquisitions, ABN issued a series of debt securities (junk bonds), including 10 3/8% Senior Notes due June 1, 2002 ("10 ⅜ Notes") "secured by a pledge of all the issued and outstanding shares of capital stock" of ABN and its then wholly-owned subsidiary Holographics, as well as 65% of the shares of American Banknote Brazil (its Brazilian subsidiary). Through this offering, ABN raised approximately $126.5 million. (ABN Compl. ¶ 35.) Other ABN efforts at financing were less successful. For example, as a result of concerns over the volatility of the economy in Brazil, where ABN derived 40% of its total revenues, ABN was forced to postpone a November 1997 $225 million bond offering. By the end of 1997, ABN's long-term debt had reached $293 million, 43% of which represented the 10 ⅜ Notes. (*Id.*)

During the period from May 1996 through January 1999, the Class Period alleged by the ABN Plaintiffs, ABN filed annual Form 10–K and quarterly Form 10–Q reports with the SEC as required. Each of the filings contained, among other things, a consolidated financial statement for ABN that combined the results of its subsidiaries. ABN issued press releases that coincided with each filing, which discussed or quoted from the financial statements. These financial statements included the financial reports of ABN's subsidiary, Holographics. In its form 10–K for fiscal year 1997, filed with the SEC on March 31, 1998, ABN admitted that its was highly leveraged; its long-term debt of approximately $293 million represented 84% of its total capitalization.

ABN viewed the spin-off and initial public offering of Holographics as a way to resolve its own debt problems. In a May 5, 1998 press release announcing the registration of the Holographics public offering, ABN noted that it intended to use a large portion of the proceeds to retire its senior secured debt, specifically, the 10 ⅜ Notes. As ABN CEO Morris Weissman stated in the release: "[W]e intend to de-leverage and are taking the necessary steps to insure the success of the program. In addition, we hope to raise capital for our subsidiaries so that they can continue to grow, unencumbered by the burden of heavy corporate debt."

On July 13, 1998, Holographics filed Amendment 4 to its Registration Statement. On July 15, 1998, it filed its final Prospectus. The final Registration Statement and Prospectus contained financial statements for the years ended December 31, 1996 and 1997, as reported from audited financial statements by Defendant De-

loitte, and the three-month periods ending March 31, 1997 and March 31, 1998, as reported from unaudited financial statements. In those financial statements, Holographics reported sales of $28,649,000 for the year ended December 31, 1996, as compared with sales of $30,915,000 for the year ended December 31, 1997. Net income was reported to be $4,820,000 for 1996 and $7,539,000 for 1997. In comparing year-end sales figures in the Registration Statement and Prospectus, Holographics stated:

> Sales increased by $2.3 million, or 7.9%, from $28.6 million in 1996 to $30.9 million in 1997. The increase in sales was due primarily to an increase in sales volume of security holograms, including a $6.9 million order from a major customer which was received and completed in December 1997 and which goods were transferred to the Company's on-site secured facility. (Holographics Compl. ¶ 37.)

For the three-months ending March 31, 1997 and March 31, 1998, sales were reported as $5,241,000 and $7,035,000 respectively, with net income reported as $657,000 for the quarter ended March 31, 1997, and $1,793,000 for the quarter ended March 31, 1998. In comparing these figures, the Prospectus stated:

> Sales increased by $1.8 million, or $34.2%, from $5.2 million for the three months ended March 31, 1997 to $7.0 million for the three months ended March 31, 1998. The increase in sales was due primarily to increased sales volume of transaction cards and product authentication holograms. The increase in transaction card hologram volume was dues to the growth in loyalty programs, competition among financial institutions resulting in increased multi-card issuance and the increased use of automated teller machine and debit cards. The increase in product authentication hologram sales volume was due to higher demand for this product and new product authentication customers

> ... Cost of goods sold decreased by $0.2 million ... This decrease reflects the Company's focus on controlling costs, improving production yields and the higher margins earned on security holograms. (Holographics Compl. ¶ 38)

The initial public offering of Holographics was commenced on July 15, with an offering of 13,636,000 shares at $8.50 per share.

Morris Weissman, the Chairman and Chief Executive Office of ABN, was named Chairman and CEO of Holographics. ABN received the entire net proceeds of the offering—approximately $106.7 million—which it used to pay off some of its debt. In August, ABN announced a cash tender offer for $70 million of the 10 3/8% Senior Notes it had issued. Following the IPO, ABN, which had sold its entire holdings of Holographics in the IPO, had no remaining ownership of Holographics.

The price of Holographics stock rose from $8.50 per share in the IPO to a high (for the Holographics Class Period) of $18 per share on December 18, 1998. (Holographics Compl. ¶ 53).

On January 19, 1999, Holographics issued a press release indicating that it was investigating certain transactions during the second and third quarters of 1998 that "resulted in the inappropriate recognition of revenue during such quarters" (Holographics Compl. ¶ 50). Holographics noted that there may have been overstatements of revenue results in those two quarters that "may be material." (Id.) According to the January 19, 1999 announcement, "[t]hese overstatements ... will require re-statements of [Holographics's] financial statements for such periods." (Id.)

ABN issued a press release that same day, announcing that Holographics had issued the aforementioned press release and quoting that press release verbatim. The ABN press release went on to state:

> [B]ased upon currently available information resulting from the in-progress

1998 audit of the Company's [Holographics'] financial statements, sales and net income of the Company have been overstated for the second and third quarters of 1998. These overstatements may be material and will require restatement of the Company's financial statements for such period. (Holographics Compl. ¶¶ 88–89).

ABN conceded that the required restatement would result in a decrease in operating income and reported returns for the second quarter of 1998. *Id.*

The price of Holographics stock dropped sharply from $15.12 per share on January 19, 1999 to $4.56 per share on January 20, 1999. Less than one week later, on January 25, 1999, Holographics reported:

Based upon currently available information, the company expects that revenues and net income for the year ended December 31, 1998 will be substantially lower than for the year ended December 31, 1997, and that the Company's interim financial statements for each of the first three quarters of 1998 will require restatement. The Company also currently believes that net income of the Company has been overstated for each of the years ended December 31, 1997 and December 31, 1996 by approximately 10%. Accordingly, the Company's financial statements as of December 21, 1997 and 1996 and for each of the three years in the period ended December 31, 1997 and the related Report of Independent Auditors should no longer be relied upon. (Holographics Compl. ¶ 51.)

On February 1, 1999, Holographics announced that the net income for the year ended December 31, 1997 had been overstated by more than 50%, rather than the 10% estimated in the January 25 announcement. Following this announcement, the price of Holographics common stock fell to $1.62 per share.

On February 4, 1999, Holographics announced the resignation of defendants Cantor and Macchiarulo. (Holographics Compl. ¶¶ 16, 17.) On April 9, 1999, Ho-lographics announced the resignation of Weissman from the company. Holographics' new president and chief operating officer stated, "[The Holographics'] board decided it was in [the Company's] best interest to rid itself of those officials under whose watch the company ran into serious financial problems." (*Id.* ¶ 55.)

On April 15, 1999, Holographics announced that: (a) its annual report on Form 10–K for the year ended December 18, 1998 would be delayed and that it also anticipated that its report on Form 10–Q for the first quarter of 1999, due to be released on May 17, 1999, would also be delayed; (b) its financial statements for the years ended December 31, 1997 and December 31, 1996 as well as the interim financial statements for each of the first three quarters of 1998, would require restatement; (c) it had been notified by its commercial banks, led by the Chase Manhattan Bank, that events of default existed under the Company's Credit Agreement "as a result of the financial statement misstatements and related matters disclosed in the Company's press releases of January 19, January 25, and February 1, 1999;" and (d) the SEC had initiated a formal investigation into the Company's previously disclosed financial misstatements. (*Id.* ¶ 56.)

On April 20, 1999, ABN announced that its financial statements for the years ended December 31, 1997 and December 31, 1996, as well as the interim financial statements for the first three quarters of 1998, would require restatement concurrent with the restated financial statements of Holographics. (ABN Compl. ¶ 2.) ABN further stated that it would seek a delay in filing its form 10–K for the fiscal year ended December 31, 1998 and disclosed that the SEC had initiated a formal investigation against it relating to Holographics' revenue recognition issues.

A number of ABN and Holographics shareholders filed lawsuits. This Court consolidated these cases for pre-trial pur-

poses on April 9, 1999. The Holographics Plaintiffs filed an Amended Consolidated Complaint on May 10, 1999, on behalf of a putative class of shareholders who purchased Holographics shares between July 15, 1998 (the date of the IPO) and February 1, 1999. The ABN Plaintiffs filed a consolidated Complaint on May 10, 1999, on behalf of shareholders of ABN who purchased shares in ABN during the period from May 2, 1996 through January 25, 1999 inclusive.

At the time the motions were filed, neither ABN nor Holographics had filed a report on Form 10–K for the year ended December 31, 1998, or a report on Form 10–Q for the quarter ended March 31, 1999. On August 3, 1999, the New York Stock Exchange suspended trading in Holographics and ABN stock and delisted both stock issues.

On December 8, 1999, ABN voluntarily filed for bankruptcy under Chapter 11 in the United States Bankruptcy Court for the Southern District of New York. *See In re American Banknote Corp.*, Case No. 99 B 11577 (Bankr.S.D.N.Y.1999). The automatic stay of proceedings against ABN that was ordered as a result of ABN's voluntary filing of bankruptcy under Chapter 11 has been lifted pursuant to the order of Bankruptcy Judge Carter Beatty for the purposes of deciding the motions before me. *See In re American Banknote Corporation*, Case No. 99 B 11577(PCB), Order Modifying Automatic Stay, (Bankr. S.D.N.Y.) (Mar. 16, 2000). I therefore address all the claims brought against the parties who have filed motions to dismiss.

III. *Standards on a Motion to Dismiss*

On a motion to dismiss under Fed. R.Civ.P. 12(b)(6), this Court must accept the well-pleaded factual allegations in the Complaint as true. *See Grandon v. Merrill Lynch & Co.*, 147 F.3d 184, 188 (2d Cir.1998). The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at trial but merely to determine whether the com-plaint itself is legally sufficient." *Goldman v. Belden*, 754 F.2d 1059, 1067 (2d Cir.1985). *See Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974); *Cruz v. Beto*, 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The Court need not credit conclusory statements unsupported by fact allegations or legal conclusions and characterizations presented as factual allegations. *Papasan v. Allain*, 478 U.S. 265, 286, 106 S.Ct. 2932, 92 L.Ed.2d 209 (1986). However, if the Complaint, read as a whole, can be construed to state any claim on which relief may be granted, I must not dismiss it. *See Stewart v. Jackson & Nash*, 976 F.2d 86, 87 (2d Cir.1992).

This liberal pleading standard is modified by Fed.R.Civ.P. 9(b) in cases where fraud is alleged. In addition, the PSLRA requires application of a heightened pleading standard to claims brought under Section 10(b) of the Exchange Act. These special pleading rules are discussed below.

IV. *Discussion of Holographics Class Claims*

The Holographics Plaintiffs bring claims under the 1933 Securities Act and the 1934 Exchange Act.

A. *The 1933 Securities Act Claims*

The Holographics Plaintiffs allege violations of Section 11 of the Securities Act against Holographics, Deloitte, Nationsbanc, Lazard, Raymond James, Smith Barney, and Defendants Weissman, Cantor and Macchiarulo; violations of Section 12(a)(2) against ABN, Holographics, Nationsbanc, Lazard, Raymond James and Smith Barney; and violations of Section 15 against ABN, Holographics, Weissman, Cantor and Macchiarulo. ABN, Holographics, the Underwriters, Weissman and Macchiarulo move to dismiss the claims pursuant to Rules 9(b) and 12(b)(6) of the Fed.R.Civ.P. and the pleading requirements of the PSLRA.

Section 11 provides in relevant part:

In case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading, any person acquiring such security (unless it is proved that at the time of such acquisition he knew of such untruth or omission) may, either at law or in equity, in any court of competent jurisdiction sue—

(1) every *person who signed the registration statement;*

(2) every person who was a *director* [or performing director functions] *of the issuer;*

(3) every person [named in the statement as] about to become a director;

(4) every *accountant,* [and other professionals who give certification of the registration or having prepared any valuation contained therein];

(5) every *underwriter* with respect to such security.

15 U.S.C. § 77k(a) (emphasis added).

An issuer is strictly liable for false statements and misrepresentations in the registration statement. *See* 15 U.S.C. § 77k(b).

Section 12(a)(2) of the 1933 Act establishes the liability of "any person who . . . offers or sells a security . . .":

by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in light of the circumstances under which they are made, not misleading (the purchaser not knowing of such untruth or omission), and who shall not sustain the burden of proof that he did not know, and in the exercise of reasonable care could not have known, of such truth or omission. . . .

15 U.S.C. § 77l (2).

1. *Plaintiffs Standing Under the 1933 Act*

■ The threshold issue raised by the Defendants is whether the lead Plaintiffs named in the Holographics Complaint have standing to sue under Sections 11, 12 and 15 of the 1933 Act. Defendants contend that Plaintiffs' claims under Sections 11 and 12(a)(2) of the Securities Act must be dismissed because standing to sue under those sections is limited to those shareholders who make stock purchases directly in an IPO. Those who purchase shares in the aftermarket may avail themselves of the anti-fraud remedies of the Exchange Act, which confers standing upon all shareholders who make market purchases, regardless of who the seller is.

The amended and consolidated Holographics Complaint names three lead plaintiffs, David Slyman, Clarion Partners LLP and Ufuk Turkel. All three of them purchased shares in the aftermarket. (*See* Holographics Compl. ¶ 12). In *Gustafson v. Alloyd Co.,* 513 U.S. 561, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995), the Supreme Court held that both the intent of Congress and the design of the Securities Act require that the remedy available under Section 12(2)(a) [formerly 12(2)] be limited to persons who purchase directly in public offerings, and not extended to whose who purchase in the secondary market. *Gustafson,* 513 U.S. at 571, 115 S.Ct. 1061. *See, e.g., In re WRT Energy Sec. Litig.,* 1997 WL 576023 *1 (S.D.N.Y. Sept. 15, 1997) ("Following *Gustafson* . . . plaintiffs have standing under Section 12(a)(2) only if they purchased their securities in a public offering rather than in the secondary market."); *Komanoff v. Mabon Nugent & Co.,* 884 F.Supp. 848, 857 (S.D.N.Y.1995) ("Section 12(2) extends only to initial offerings of stock, and not to secondary market transactions.").

Defendants contend that, where the named plaintiffs have no right to assert a claim, the claim must fail for lack of "representativeness" of the lead plaintiff's (or plaintiffs') claim. (Def. Underwriter's Rep.Br. at 4). *See Kirkwood v. Taylor,* 590 F.Supp. 1375, 1385 (D.Minn.1984) (Sec-

tion 11 claim failed where lead plaintiff lacked standing), *aff'd,* 760 F.2d 272 (8th Cir.1985). It is well established that a plaintiff seeking to represent a class must be a member of the class he purports to represent. *See, e.g., Bailey v. Patterson,* 369 U.S. 31, 32–33, 82 S.Ct. 549, 7 L.Ed.2d 512 (1962); *Nat'l Super Spuds, Inc. v. Mercantile Exchange,* 660 F.2d 9 (2d Cir. 1981). And of course Defendant is correct that a plaintiff who cannot allege all the claims brought by the class may not be an appropriate single lead plaintiff of the class.

Under *Gustafson,* the Slyman, Clarion Partners and Turkel do not have standing to maintain the 12(a)(2) claims against Defendants. However, the Complaint names a co-lead plaintiffs group, which includes David J. and Chaile Steinberg, Caroline Weisz, Beatrice Levy, Tom Yuan, Tim Feuz, Brian LeMay, Daniel Kursman, Gerbrilor International Corporation, Mei–Yu Chuang, Barry Goldberg, Royce Porkert, Thomas J. Panagiotatos, James S. Krieger, Muriel Motter, Alvin Pasternak, William Furling, III and Deborah Krohn, some of whom purchased shares directly in the IPO. (*See id.;* Schiller Aff.Exh. E; Safferstein Aff.Exh. A.) The nomination of a group of investors as co-lead plaintiffs is specifically contemplated by the PSLRA. *See* 15 U.S.C. § 78u–4(a); *In re Network Assocs. Sec. Litig.,* 76 F.Supp.2d 1017, 1025 (N.D.Cal.1999) (noting PSLRA specifies that lead plaintiffs might be a group of persons who have "joined forces" for the litigation). Because thirteen of the co-lead plaintiffs purchased their shares directly in the IPO, and because the PSLRA allows the Court to appoint more than one lead plaintiff, the Plaintiff class has standing.

Defendants are correct to note that the holding in *Gustafson* (which by its terms applies only to Section 12(1) of the 1933 Act) has been interpreted by some courts as requiring a plaintiff bringing a Section 11 to allege that it has purchased shares directly from the issuer in the public offering. The issue of plaintiff standing under Section 11 has been directly addressed by three district courts in this Circuit, with conflicting results. *Compare In re Fine Host Corp. Securities Litigation,* 25 F.Supp.2d 61 (U.S.D.Conn.1998) (named plaintiffs who purchased shares in the aftermarket had standing under Section 11) and *Adair v. Bristol Tech. Systems, Inc.,* 179 F.R.D. 126 (S.D.N.Y.1998) (holding that investors who can "trace" their purchases to the IPO have Section 11 standing) *with In re WRT Energy Sec. Litig.,* 1997 WL 576023 (S.D.N.Y., Sept. 15 1997) (concluding that only plaintiffs who purchased in the public offering have standing under Section 11). Because the co-lead Plaintiffs group includes those who purchased their shares directly in the IPO, the class has Section 11 standing as well as Section 12(a)(2) standing. It is therefore unnecessary to decide here whether those Plaintiffs who can "trace" their purchases to the IPO have standing under Section 11.

### 2. *Section 11 Liability*

ABN argues that the Holographics' Plaintiffs' Section 11 claim against it should be dismissed because ABN is not among the parties against whom a claim can lie for false or misleading statements contained in the registration statement. ABN contends that Holographics was the "issuer" of the Holographics shares offered in the IPO, not ABN. Defendant Holographics argues, however, that "while Holographics may be alleged to be the 'issuer,' it did not own any of the shares sold in the IPO (ABN did), and all the proceeds of such went to ABN." (Holographics' Mem. at 8.) Plaintiffs therefore contend that ABN was the *de facto* issuer.

As noted above, Section 11 enumerates the categories of persons liable for making misleading statements in a registration statement, which includes the "issuer" of the security. An "issuer" is defined under Section 2(a)(4) of the 1933 Act as "every person who issues *or proposes to issue* any security...." 15 U.S.C. § 77(b)(a)(4) (em-

phasis added). Section 6(a) of the Securities Act provides further that:

> Any security may be registered with the Commission under the terms and conditions hereinafter provided, by filing a registration statement ... which *shall be signed by each issuer*, its principal executive officer. . . .

15 U.S.C. § 77f(a) (emphasis added).

■ Liability under Section 11, however, is "reserved for parties 'who are signators of the registration statement, directors or partners of the issuer, experts named as preparing or certifying a portion of the registration statement, or underwriters of that issue.'" *O'Sullivan v. Trident Microsystems, Inc.*, No. C 93–20621 (1994 WL 124453, *10) (N.D.Cal. Jan. 31, 1994) (internal citation omitted). ABN did not sign the Registration Statement. Therefore, under Section, it cannot be the issuer.

■ The Holographics Plaintiffs argue that, even though ABN's name was absent from the registration statement, it also functioned as the "issuer." In support of this argument, they point to ABN's own admission that it "sold its shares in Holographics to various underwriters pursuant to a firm commitment underwriting," (ABN Memo at 3–4 (citing Holographics Compl. ¶ 14)) which Plaintiffs describe as an "offering by [ABN]." (Holographics Compl. ¶ 14.) Moreover, Plaintiffs note that Morris Weissman, who signed the registration statement on behalf of Holographics, served concurrently as CEO of ABN and Holographics. Plaintiffs argue that the registration statement was signed by an "officer of the issuer" (albeit in his Holographics capacity).

Plaintiffs cite no case law to support either of these arguments, and I find them without merit. First, the fact that Weissman held directorships in both ABN and Holographics may impute liability to ABN for misrepresentations (see discussion of Section 10–b liability below), but does not transform ABN into an "issuer." As long as Weissman signed the statement as CEO

of Holographics, Holographics was the issuer, within the meaning of the statute. Second, that ABN may have "offered" the securities or made solicitations regarding the sale of securities is relevant to its status as a statutory "seller" within the meaning of Section 12 (see below), but does not make it an "issuer" within the meaning of Section 11. By its clear language, Section 11 limits liability to signatory issuers, officers and directors, underwriters and auditors. The Section 11 claim is therefore dismissed as against ABN.

### 3. *Section 12 Liability*

All Defendants move to dismiss the Section 12 claims against them. Holographics moves on the ground that, even if Plaintiffs have standing to sue, Holographics is not a "seller" within the meaning of Section 12(a)(2), and thus cannot be liable as a matter of law. ABN moves to dismiss on the basis that it was not a statutory seller in the Holographics IPO. And the Underwriters argue that the Section 12(a)(2) claim against them fails because the Plaintiffs did not allege either that they purchased stock directly from the Underwriters or that the Underwriters directly solicited their stock purchases.

Plaintiffs respond that both Holographics and Underwriters either sold or solicited the sale of the shares, so both are statutory sellers. Plaintiffs further respond that ABN transferred title of the shares to the underwriters and actively solicited the sale of the securities with the motive of serving its own financial interest, either one of which makes it a statutory seller.

■ Section 12(a)(2), as noted above, creates liability against any person who "offers or sells" newly issued securities "by means of a prospectus or oral communications." 15 U.S.C. § 77l(a)(2). The term "seller" was defined by the Supreme Court in *Pinter v. Dahl*, 486 U.S. 622, 108 S.Ct. 2063, 100 L.Ed.2d 658, (1988), as the "owner who passed title, or other interest.

438

in the security, to the buyer for value," *or* a "person who successfully solicits the purchase, motivated at least in part by a desire to serve his own financial interests or those of the securities owner." *Id.* at 647, 108 S.Ct. 2063. The *Pinter* Court emphasized that Section 12 liability depends on the "defendant's relationship with the plaintiff-purchaser" *Pinter,* 486 U.S. at 651, 108 S.Ct. 2063. The Court concluded that a broader definition was undesirable because it "might expose securities professionals, such as accountants and lawyers, whose involvement is only the performance of their professional services." *Id.* at 651, 108 S.Ct. 2063. Although *Pinter* was a section 12(1) case, the Second Circuit has applied its rationale to Section 12(2) claims as well. *See Capri v. Murphy,* 856 F.2d 473, 478 (2d Cir.1988).[3]

In applying the *Pinter* analysis to 12(2) claims, courts have consistently held that a plaintiff must plead or prove (1) that a defendant directly sold stock to the plaintiff or (2) directly solicited the plaintiff's purchase of stock. *See Capri,* 856 F.2d at 479 ("[P]laintiffs must show that LCG actually solicited their investment in GCA...."); *See also In re Gas Reclamation, Inc. Sec. Litig.,* 733 F.Supp. 713, 723 (S.D.N.Y.1990) ("The investors, therefore, must present contradictory evidence to support their claim that [defendant] ... directly solicited the purchase of GRI units from the investors."); *In re Westinghouse Sec. Litig.,* 90 F.3d 696, 717–718 (3d Cir. 1996) (holding that allegation that underwriters in public offering "sold Westinghouse securities 'directly to plaintiffs and other class members'" was sufficient to state a claim.).

Under this analysis, ABN, Holographics and the Underwriters are all "sellers."

■ First, ABN owned the shares, and it passed title of the shares it owned. The Complaint also alleges active solicitation of sales which "included participating in the

3. For example, after *Pinter,* there is no separate aider and abettor liability under Section 12. *See Wilson v. Saintine Exploration &*

preparation of the false and misleading Registration Statement and Prospectus and participating in 'road shows' to promote the sale of [Holographics] common stock." (Holographics Compl. at ¶ 88).

ABN argues that, because it is not the issuer and because the Underwriters passed title to the ultimate buyers of the stock, ABN cannot be held liable as the "seller." In addition, ABN contends that the mere allegation that ABN issued a press release announcing the Holographics IPO and participated in preparation of the Prospectus and in "road shows," is inadequate to make a claim that ABN solicited sales under the *Pinter* test. However, it has been specifically alleged that ABN was motivated to actively solicit sales in order to raise as much money as possible in the IPO. I must presume that allegation to be true at this point in the litigation.

Thus, ABN is a seller, under both prongs of *Pinter.*

■ Second, the Underwriters are sellers. The Underwriters argue that, under *Pinter,* a conclusory allegation concerning solicitation of unspecified investors in not sufficient to state a Section 12(a)(2) claim. However, Plaintiffs point out that the Holographics IPO was a "firm commitment" offering in which the Underwriters directly passed title to public investors.

In a "firm commitment" underwriting:

the underwriters agree that they will purchase the shares being offered for the purpose of resale to the public. The underwriters must pay for and hold the shares for their own account if they are not successful in finding public purchasers. This form of underwriting is almost always used by the larger underwriters and provides the greater assurance of raising the desired funds.

R. Jennings & H. Marsh, Jr., *Securities Regulation* 135 (6th ed.1987).

*Drilling Corp.,* 872 F.2d 1124, 1127 (2d Cir. 1989).

In a firm commitment underwriting, the underwriter is the *owner* of whatever shares fail to sell in the public offering. *See Jackson Nat'l Life Ins. Co., v. Merrill Lynch & Co., Inc.*, 32 F.3d 697, 701 (2d Cir.1994). A direct sale to public investors makes an underwriter a "seller" within the meaning of Section 12(a)(2) under the first prong of the *Pinter* test. *See Akerman v. Oryx*, 810 F.2d 336, 343 (2d Cir.1987). Thus, the Underwriters are sellers for purposes of 12(a)(2) liability.

■ Third, Holographics was a seller. Holographics argues that precisely because the IPO was a firm commitment underwriting, it was not a seller or solicitor of purchases. Holographics further contends that it was never the "owner" of the shares sold in the IPO; rather, ABN, its parent company, was the "owner" of Holographics prior to the IPO. Thus, only ABN could transfer title to the shares.

While it may be true that Holographics was not the owner, and therefore could not transfer title to the shares, Holographics nonetheless actively solicited the sale of the shares through participation in preparation of the registration statement and prospectus and in road shows, "with a motivation to serve [its] own financial interests *or those of the securities' owner*" here, ABN. *Degulis v. LXR Biotechnology, Inc.*, 928 F.Supp. 1301, 1314–15 (S.D.N.Y. 1996) (citing *Commercial Union Assur. Co., plc v. Milken*, 17 F.3d 608. 616 (2d Cir.1994) (emphasis added)). Solicitations made by the to-be-spun-off subsidiary have been held to meet the definition of "seller" under the second prong of *Pinter*, as have solicitations by the parent company.[4]

The facts of *In re U.S.A. Classic Sec. Litig.* [1995 Transfer Binder] Fed.Sec. L.Rep. (CCH) ¶ 98,837 (S.D.N.Y. Jan. 19, 1995) are similar to those here. There, the parent company owned all the stock of the newly public former subsidiary, which was sold through underwriters in a public offering. The Court denied both the corporate parent's and the former subsidiary's motions to dismiss the Section 12(a)(2) claim on the ground they were not statutory sellers, holding the underwriters and the parent corporation to be "sellers" (since they passed title to the stock), and holding the subsidiary to be a "seller" because it solicited the sale of U.S.A. Classic's stock. *Id.* at 93,047.

### 3. Pleading Requirements under 1933 Act

■ Fraud is not an element of claims brought under Sections 11 and 12(a)(2) of the Securities Act, and, ordinarily, the heightened pleading requirements of Federal Rule of Civil Procedure 9(b) do not apply to such claims. Nonetheless, the Defendants each argue that the pleading requirements of 9(b) should be applied to Section 11 and 12(a)(2) claims here because: (1) the Complaint bases the Securities Act claims on the same facts which serve as the basis for the 10(b) claims; and (2) the Complaint alleges fraudulent intent. *See Schoenhaut v. American Sensors, Inc.*, 986 F.Supp. 785, 795 (S.D.N.Y.1997).

Plaintiffs respond that their claims against the Underwriters sound in negligence, and are not subject to Rule 9(b). They also assert that the Section 11 and 12(a)(2) claims against the other Defendants are also not subject to heightened pleading. Finally, Plaintiffs argue that even if the 1933 Act claims were subject to Rule 9(b) standards, they have pled with sufficient particularity.

The claims against Defendants ABN, Holographics, Macchiarulo and Weissman

---

4. Defendant ABN cites cases in this district standing for the proposition that, in order to be liable under Section 12(a)(2) as a "solicitor" of sales, defendant must be alleged to have personally solicited the sale from plaintiff. *See In re Gas Reclamation, Inc. Sec. Litig.*, 733 F.Supp. 713, 723–24 (S.D.N.Y. 1990); *Pompano–Windy City Partners, Ltd. v. Bear Stearns & Co.*, 794 F.Supp. 1265, 1283–85 (S.D.N.Y.1992). This requirement, however, is not absolute; where significant involvement in the solicitation is found, a defendant may be liable under Section 12(a)(2). *See Capri v. Murphy*, 856 F.2d 473 (2d Cir.1988).

sound in fraud. The facts alleged against them as violations of Sections 11 and 12(a)(2) (and for ABN, Macchiarulo and Weissman, Section 15) are precisely the same facts alleged against them for violation of 10(b) and Rule 10b–5: namely, that they participated in a fraudulent scheme to artificially inflate the price of Holographics' shares by issuing false or misleading financial statements that were included in the Registration Statement and Prospectus and in subsequent press releases. And because the Plaintiffs allege a scheme of fraud against these Defendants, I find the boilerplate disclaimer of fraud in the Complaint not valid as applied to the 1933 Act claims against ABN, Holographics, Weissman and Macchiarulo. *See In re Stac Elecs. Sec. Litig.,* 89 F.3d at 1405 n. 2 (applying Rule 9(b) even though the complaint specifically disclaimed any reliance on fraud for the § 11 claim, finding "[t]hese nominal efforts ... unconvincing where the gravamen of the complaint is plainly fraud and no effort is made to show any other basis for the claims levied at the Prospectus"). I therefore find that Plaintiffs are required to meet the heightened pleading standards of Rule 9(b) and the PSLRA as against ABN, Holographics, Macchiarulo and Weissman.

However, for the reasons stated in my discussion of the 1934 Exchange Act Section 10(b) claims below, I find that Plaintiffs have pled with sufficient particularity to meet the Rule 9(b) and the PSLRA pleading requirements. (*See infra.*)

The claims against the Underwriters do not sound in fraud. The Holographics Complaint does not allege a Rule 10b–5 claim against the Underwriters, nor does it allege that the Underwriters acted fraudulently. (*See* Holographics Compl. ¶¶ 78, 86.) In fact, the Complaint expressly disclaims fraud claims against the Underwriters: "Plaintiffs repeat and reallege each of the allegations set forth in the foregoing paragraphs, *except to the extent any allegations contained above may be interpreted to sound in fraud, such allegations are*

*expressly not incorporated under this Count.*" (Holographics Compl. ¶¶ 78, 86.) Therefore, no heightened pleading requirement applies.

■ The Plaintiffs have also not pleaded "fraudulent intent" against the Underwriters. The Underwriters contend that the allegations in the Complaint introduce the Underwriters's state of mind: "Defendants failed to disclose the existence of known trends, events or uncertainties that it [sic] reasonably expected would have a material unfavorable impact on net revenues or income or that were reasonably likely to result in the Company's liquidity decreasing in a material way." (Holographics Compl. ¶ 59.) Nothing in this paragraph, however, alleges fraudulent intent or state of mind. It merely contends that the Prospectus and Registration Statement contained information that was materially false and misleading.

The cases cited by the Underwriters to support their contention that heightened pleading applies to the claims against them are distinguishable. In those cases, the plaintiffs alleged both Section 11 and 12(a)(2) violations and 1934 Exchange Act Section 10(b) violations against the moving defendants. *See Geiger v. Solomon–Page Group, Ltd.,* 933 F.Supp. 1180 (S.D.N.Y. 1996) (asserting Section 10(b) claims against all defendants); *UBS Asset Mgmt. (New York) Inc. v. Wood Gundy Corp.,* 914 F.Supp. 66, 68 (S.D.N.Y.1996) (asserting Section 10(b) claims against the sole moving defendant); *Melder v. Morris,* 27 F.3d 1097, 1104 (5th Cir.1994) (affirming dismissal of claims against underwriter for failure to "adequately plead scienter"), *cert. denied sub nom., Anderson v. Clow,* 520 U.S. 1103, 117 S.Ct. 1105, 137 L.Ed.2d 308 (1997).

*Section 15 Control Liability*

Section 15 establishes liability for "control persons"who:

[B]y or through stock ownership, agency, or otherwise, or who, pursuant to or in connection with an agreement or un-

derstanding with one or more other persons by or through stock ownership, agency, or otherwise, controls any person liable under sections 77k or 77*l* of this title shall also be liable . . .

15 U.S.C. § 77o.

 In order to survive a motion to dismiss a claim for controlling person liability under Section 15, plaintiffs must allege "(1) an underlying primary violation by the controlled person; (2) control [by the defendant] over the controlled person; and (3) particularized facts as to the controlling person's culpable participation in the fraud perpetrated by the controlled person." *Ellison v. American Image Motor Co., Inc.*, 36 F.Supp.2d 628, 637–38 (S.D.N.Y.1999) (applying the same test to 1933 Act Section 15 claims and 1934 Act Section 20(a) claims). Plaintiffs have alleged an underlying violation by Holographics, and have alleged that Weissman and Macchiarulo were in positions of control over the alleged conduct of Holographics. As discussed below in the analysis of the Section 10(b) claims, I find that Plaintiffs have adequately pled particularized facts as to ABN's, Weissman's and Macchiarulo's culpable participation. Therefore, Plaintiffs have stated a claim for control person liability under Section 15.

**5.** Section 10(b) of the Exchange Act provides in relevant part that:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—...

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules an regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j.

SEC Rule 10b–5 provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means of instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

## B. *1934 Securities Exchange Act Claims*

The Holographics Plaintiffs allege that ABN, Holographics, Weissman and Macchiarulo violated Section 10(b) of the Exchange Act and Rule 10b–5, on a "fraud on the market" theory of liability. (Holographics Compl. ¶¶ 97–112). Defendants move for dismissal on the basis that Plaintiffs have failed adequately to plead scienter or to meet the heightened fact pleading requirements of Rule 9(b) and the PSLRA.

### 1. *Section 10(b) and Rule 10b–5 Liability*

 To state a cause of action under Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder,[5] a plaintiff must plead that, in connection with the purchase and sale of securities, the defendant (1) made a misstatement or omission (2) of a material fact, (3) made with scienter, (4) on which the plaintiff relied (5) that proximately caused his injury. *See Chill v. General Electric Co.*, 101 F.3d 263, 266 (2d Cir.1996). Because 10(b) sounds in fraud, Plaintiffs must both plead scienter and plead facts amounting to fraud with particularity as required under Fed.R.Civ.P. 9(b) and the PSLRA.[6]

(a) To employ any device, scheme or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

**6.** The PSLRA provides in relevant part:

The complaint shall, with respect to each act of omission alleged ... state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2).

The Second Circuit has held that, under Rule 9(b) and the pleading requirements of the PSLRA, a plaintiff alleging fraud must: " '(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (quoting *Mills v. Polar Molecular Corp.*, 12 F.3d 1170, 1175 (2d Cir.1993) (citation omitted)). Further, where a defendant's state of mind is at issue, the complaint must "with respect to each act or omission alleged to violate [the federal securities laws], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2). The Second Circuit has held that this scienter requirement can be satisfied by pleading specific facts that (1) show the defendant had a *motive* for committing the fraud and a clear opportunity for doing so, *or* (2) indicate *conscious or reckless behavior* by the defendant. *See Press v. Chemical Investment Services Corp.*, 166 F.3d 529, 537–38 (2d Cir.1999).

Holographics, Macchiarulo and Weissman each contend that, where the complaint is made against multiple defendants, it is insufficient to make blanket references to the acts and scienter of all of them, without identifying the nature of each defendant's state of mind and participation in the alleged fraud. *See Shields v. Citytrust Bankcorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994) (under Rule 9(b), a complaint making securities fraud allegations must "identify the speaker"). They argue that the Complaint improperly groups all the defendants together, and therefore does not provide particularized allegations against each of them. ABN argues that Plaintiffs fail to plead with particularity any acts committed by ABN, impermissibly imputes the knowledge and conduct of Weissman (in his capacity as CEO of Holographics) to ABN, and thereby make at best an assertion that ABN aided and abetted the actions of the other Defendants.

While it is true that there can be no aider and abettor liability under 10(b) and Rule 10b–5, *see Central Bank of Denver N.A. v. First Interstate Bank of Denver*, 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994), grouping defendants together in the complaint does not in itself make the allegations defective. It is well settled that plaintiffs may engage in so-called group-pleading under 10(b) and Rule 10b–5; nothing in the PSLRA has altered that doctrine. *See In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999) (citing *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir.1987)). In the cases cited by Defendants, the pleadings were inadequate, not because the plaintiffs grouped defendants together in describing the factual allegations, but because they failed to particularize what statements were fraudulent and where, when and why they were made. The instant Complaint does not suffer from the same defect.

a. *Material Misrepresentation or Omission*

The claims made against Weissman, Macchiarulo and Holographics include the central allegation that each of them made material misrepresentations in public financial disclosure statements, including the financial reports that were incorporated in the Prospectus and Registration Statement. (Comp.¶¶ 99, 100). In addition, Weissman is alleged to have made misrepresentations in several press statements. The test for materiality under Rule 10b–5 is whether there is "a substantial likelihood that a reasonable shareholder would consider it important in deciding how to [act]." *Basic Inc. v. Levinson*, 485 U.S. 224, 231, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). Financial reports stating profits and losses of a company are, of course, of great interest to investors, and are ordinarily material to the

decision of a shareholder to buy or sell a share. *See In re Kidder Peabody Secs. Litig.,* 10 F.Supp.2d 398, 410 (S.D.N.Y. 1998).

 Weissman contends that Plaintiffs' pleadings are insufficient because the only statements actually attributed to him in the Complaint are not actionable as a matter of law. Weissman's statements appeared in the press releases dated May 5 and July 14, 1998:

> [W]e intend to de-leverage and are taking the necessary steps to insure the success of this program ... Out most important goal in 1998 is to enhance shareholder value. We hope to prove to the market that inherent values of our underlying operating subsidiaries, not apparent when evaluating American Banknote on the basis of traditionally consolidated earnings per share, are indeed significant. (May 5, 1998 Release; Compl. ¶ 34.)

> This IPO is a win-win for both companies. With the IPO proceeds, ABN is in a vastly improved financial condition. ABNH can now concentrate on continuing the profitable growth of its core security holography business as well as explore business and market expansion opportunities. (July 14, 1998 Release; Compl. ¶ 41.)

Weissman argues that these statements are the sort of generalized, optimistic statements about the future that courts have found not to be actionable because they are immaterial as a matter of law. *See, e.g., In re Advanta Corp. Sec. Litig.,* 180 F.3d 525, at 538 (3d Cir.1999); *San Leandro Emergency Medical Group Profit Sharing Plan v. Philip Morris Cos.,* 75 F.3d 801, 811 (2d Cir.1996) (statements that Philip Morris "should deliver income growth consistent with its historically superior performance," were "puffery"). He contends that the statements were merely his opinion, and thus do not meet the materiality requirements.

I am constrained to disagree. Weissman's statements did not reflect general-ized optimism about the future, but rather the position that Holographics was, *at the time he made the statement,* a valuable company—indeed, more valuable than the market valuation of its parent, ABN, reflected. He further stated that, following the IPO, Holographics would be able to concentrate on continuing the profitable growth it had begun while a subsidiary of ABN. As it turns out, all this was untrue at the time the statements were made. Weissman's statements are thus distinguishable from the *Advanta* and *San Leandro* statements the Second Circuit found to be mere "puffery," and satisfy the materiality requirement.

 Weissman and Macchiarulo further argue that they cannot be held liable under a theory of "group publication" for any alleged misrepresentations made in public financial statements—the Holographics 10–Qs, 10–Ks and the Prospectus and Registration Statement. Plaintiffs argue that they allege more than "group publication" of the alleged misleading and inaccurate financial statements; they allege that Weissman and Macchiarulo actually participated in the preparation of the publications and that they signed the reports. (Holographics Compl. ¶¶ 37, 43, 45, 47, 48.) By alleging that Weissman and Macchiarulo, in their respective capacities as CEO and CFO of Holographics, each participated in the preparation and publication of the financial reports, Plaintiffs have pleaded the facts of their participation in the misrepresentation with adequate particularity. (Holographics Compl. ¶ 105.)

 ABN argues that the statements at issue cannot be attributed to it and that it therefore cannot be held to have committed fraud. This ignores two key facts: (1) Prior to the IPO, Holographics operated as a fully-owned subsidiary of ABN; and (2) Weissman was CEO and President of ABN at the same time he was CEO of Holographics. While it is true that a subsidiary's fraud cannot be "automatically"

imputed to its corporate parent, *see In re Baesa Sec. Litig.,* 969 F.Supp. 238, 242 (S.D.N.Y.1997), where factual allegations are sufficient to make a claim for participation of a subsidiary in the fraudulent scheme, a corporate parent may be liable. *See In re Guilford Mills* No. 98 Civ. 7739, slip op. (S.D.N.Y. July 21, 1999). The allegations here suffice to state a Section 10(b)(5) claim against ABN. The allegations of interlocking financial, managerial and business relationships between ABN and Holographics, combined with the fact that Weissman's pre-IPO press statement can only be interpreted as being made in his dual capacity because it discussed the financial impact of the IPO on both corporate entities, are sufficient to plead fraud against ABN. Obviously, my ruling at this preliminary stage does not preclude dismissal once the record has been developed via discovery.

I further find that, independent of the statements made by Weissman, ABN can be found liable under Section 10(b)(5) for its omission of a material fact. Judge Brieant of this Court recently reaffirmed this point in *In re Oxford Health Plans, Inc. Sec. Litig.,* 187 F.R.D. 133 (S.D.N.Y. 1999), where he sustained plaintiffs' complaint against all of the defendants, even those "who did not directly make the fraudulent statements," but "had knowledge of the fraud and assisted in its preparation." *Id.* at 142. "Under First Jersey, [101 F.3d 1450 (2d Cir.1996) ], the plaintiff need not allege that [a particular defendant] made any fraudulent statements during the Class Period." *Id.* (citing *In re Health Management,* 970 F.Supp. 192, 209 (E.D.N.Y.1997)). Plaintiffs allegations of ABN's role in the fraud is more than sufficient: ABN was the main beneficiary of the net proceeds of the IPO which were paid directly to ABN; ABN, not Holographics, passed title to the stock to the Underwriters; ABN participated in preparation of the public registration statements and prospectus; and ABN prepared and/or assisted in the preparation of the Holographics financial statements.

### b. *Pleading Scienter*

As noted above, to plead scienter adequately, Plaintiffs must plead facts showing a strong inference of fraudulent intent through allegations of (1) motive and opportunity to commit fraud *or* (2) circumstantial evidence of conscious misbehavior or recklessness. I find that Plaintiffs have met their burden.

 Opportunity requires showing "the means and likely prospect of achieving concrete benefits by the means alleged;" motive can be demonstrated through pleading facts showing that "concrete benefits that could be realized by one or more of the false statements." *Shields v. Citytrust Bancorp, Inc.,* 25 F.3d 1124, 1130 (2d Cir.1994).

 Plaintiffs adequately allege that Weissman, Macchiarulo and Holographics each had the opportunity to perpetrate the alleged fraud by reporting false and misleading financial information. Weissman was at all relevant times Chairman and CEO of both ABN and Holographics. (Holographics Compl. ¶ 15). Macchiarulo was at all relevant times Vice President Finance, Chief Financial Officer and Chief Accounting Officer of Holographics, and in that capacity was specifically responsible for Holographics' financial reporting. (*Id.* ¶ 17). Such senior executives have the opportunity to commit fraud. *See, e.g., San Leandro,* 75 F.3d 801, 813 (2d Cir. 1996) (citing *In re Time Warner Inc. Sec. Litig.,* 9 F.3d 259, 269 (2d Cir.1993)). And where senior executives have the opportunity to commit fraud, that opportunity may fairly be imputed to the corporation as well. *See In re Guilford Mills,* No. 98 civ. 7739, slip op. at 8 (S.D.N.Y. July 21, 1999).

 As discussed above, ABN had the most to win by inflating the price of the IPO, and was thus motivated to make statements or omit facts that would result in a higher price. As ABN notes, however, the statements were made by Weiss-

man; "a director's knowledge may not properly be imputed to a corporation unless it is gained within the scope of his activity with respect to *that corporation.*" *Weintraub v. Texasgulf, Inc.*, 564 F.Supp. 1466, 1470 (S.D.N.Y.1983) (emphasis added). ABN argues that Weissman gained his knowledge from his activities with respect to Holographics, a separate (albeit subsidiary) corporation.

*Weintraub* is wholly inapposite in a case like this one, where the alleged wrongdoer was affiliated with two *related* corporations. In *Weintraub*, some of the directors of a corporation that was the target of a hostile takeover bid also served on the board of the corporation that made the unwelcome offer. Plaintiffs alleged that the target company issued false and misleading statements when it asserted that it was not aware of any reason for unusual trading in its stock. The Court found that the fact that three interlocking directors had actual knowledge of the takeover could not be imputed to the target corporation and its other officers.

Obviously, that case is not this case. Here, the two corporations were parent and subsidiary, and Weissman's allegedly misleading statements were made to bolster both ABN and Holographics. Regardless of the letterhead used, he made them in his capacity as a director of both corporations. Moreover, the Complaint alleges that Weissman had knowledge of the actual sales and revenue figures of Holographics in his capacity as CEO of ABN and as CEO of Holographics. Thus, Weissman's scienter can fairly be imputed to ABN.

As to Holographics' motive, Plaintiffs allege that Holographics received a concrete benefit from its participation in the scheme to inflate the price of its public offering, i.e., to enhance its ability to raise cash under the $30 million credit facility agreement with Chase Manhattan Bank. (Holographics Compl. ¶ 107). Holographics' argument that the credit facility actually represented a "burden" on Holo-

graphics resulting from the IPO is without merit. The ability of Holographics to borrow its own cash—unfettered by the already debt-laden ABN—was a benefit of the IPO. I thus find it a sufficient motive to raise an inference of fraudulent intent on the part of Holographics.

Plaintiffs have failed to plead motive against Weissman and Macchiarulo. Plaintiffs allege that Weissman and Macchiarulo each stood to benefit from the inflated offering price through enhancing the value of their personal holdings of Holographics stock; protecting and enhancing their executive compensation and positions; and further advancing the IPO in order to raise badly needed funds to satisfy ABN's substantial debt. (Holographics Compl. ¶ 106).

■ Generic allegations that seek to infer motive from benefits that are generally held by similarly situated executives have been routinely rejected by courts as insufficient to show motive. For example, in *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 53 (2d Cir.1995), plaintiffs alleged that executive officers "were motivated to inflate the value of [the company's] stock because the increase in stock price had a direct effect on their executive compensation." *Id.* The Second Circuit held that "the existence, without more, of executive compensation dependent upon stock value does not give rise to a strong inference of scienter." *Id. See also Grossman v. Texas Comm. Bancshares, Inc.*, 1995 WL 552744, *11 (S.D.N.Y. Sept. 15, 1995) ("allegations of motives that are generally held by similarly positioned executives and companies are insufficient to sustain a claim under the securities laws"); *WRT Energy*, 1997 WL 576023 at *13 (motive is not adequately plead by allegations of stock ownership or increased compensation resulting from allegedly inflated stock price); *Salinger v. Projectavision*, 934 F.Supp. 1402, 1413 (S.D.N.Y.1996) (same).

■ While Plaintiffs allege that Weissman and Macchiarulo were beneficiaries of

a stock option plan, they fail to allege actual benefit from the plan, i.e., that they sold their options or shares at a time when the Holographics share price was artificially inflated. Further, as regards Macchiarulo, Plaintiffs do not even allege that he actually owned any shares of Holographics; they allege only that he was the "intended party" of an unexecuted agreement under which he would have received options to purchase shares of Holographics. (Holographics Compl. ¶ 17(b).) Such speculative, conditional benefits do not constitute a factual allegation of "concrete benefits" required for an inference of motive under 9(b) or the PSLRA.

I must, therefore, analyze whether Plaintiffs have, in the alternative, alleged strong circumstantial evidence of conscious misbehavior or recklessness.

■ Plaintiffs allege that, as the two most senior officials at Holographics, Weissman and Macchiarulo had the authority and responsibility to enforce the company's revenue recognition policies. (Holographics Compl. ¶ 20). They further allege that, for several quarters leading up to the IPO, Weissman and Macchiarulo signed and released financial statements to the SEC that violated Generally Accepted Accounting Principles in that they incorrectly inflated revenues. These inflated numbers were, by the Defendants' own later admissions, significant: Holographics revenues were inflated by over 50% as a result of the accounting violations. Plaintiffs further allege that Weissman and Macchiarulo were present at each of the company's quarterly sales meetings, and that, as senior officials, they had reason to know what the actual sales figures and

revenues of Holographics were—both when it was a subsidiary of ABN and after it was spun off. In sum, Plaintiffs allege more than mere GAAP violations; they allege a long-term scheme to "cook the books" in a way that benefitted ABN, Holographics and, of course, the individual defendants who ran those companies.

■ It is well established that the allegation of a violation of GAAP, without more, does not meet the scienter pleading requirements of 10(b)(5) or the PSLRA. *See Chill,* 101 F.3d at 270. Defendants cite the Court to a recent case from this District as supporting their contention that the violations of GAAP alleged here do not meet the scienter requirement. *See In re Hudson Technologies, Inc. Sec. Litig.,* Civ. No. 98–1616, 1999 WL 767418, 1999 U.S.Dist. Lexis 15032 (S.D.N.Y. Sept. 28, 1999) (granting defendant's motion to dismiss under 9(b), 12(b)(6) and the pleading requirements of the PSLRA). Plaintiffs in *Hudson Technologies* alleged, *inter alia,* that defendants had overstated the company's gross profits for certain quarters "by classifying certain costs of sales as operating expenses in breach of 'GAAP'" *Id.* 1999 WL 767418, at *3, 1999 U.S.Dist. LEXIS 15032, at *11–12. Judge Koeltl rejected plaintiffs' contention that a company's admission of violations of GAAP, without more, gives rise to the requisite inference of scienter. He held that "failure to comply with standard accounting practices, coupled with later revisions of financial statements *does not alone constitute circumstantial evidence of misconduct or recklessness.*" 1999 WL 767418, at *5, 1999 U.S.Dist. LEXIS 15032 at *18–19 (emphasis added).[7]

---

7. In *Hudson Technologies,* Judge Koeltl also held that plaintiffs had failed to allege facts sufficient to show a motive to commit fraud. There, as here, plaintiffs alleged that defendants sought to inflate the company's financial results (1) "out of a desire to exaggerate [the company's] performance and to maintain their own positions within the company," (2) "to enhance the value of their personal stock and facilitate their stock sales," and (3) out of

"a desire to keep the price of the stock inflated so that [the company] could engage in specific corporate transactions." *Id.* 1999 WL 767418, at *9–10, 1999 U.S. Dist. LEXIS 15032, at *27–*31. Judge Koeltl did not, as Defendants contend, conclude that allegations that defendants were motivated to inflate the value of the Hudson stock in order to use that stock as currency were insufficient. On the contrary, he specifically held that the plain-

I find the facts in *Hudson Technologies* distinguishable. There, the Plaintiffs alleged only one GAAP violation: the overstatement of gross profits for three quarters by classifying certain costs of sales as operating expenses. The alleged difference was an overstatement of the profit margin by approximately nine percent. *See Id.* 1999 WL 767418 at *3, 1999 U.S. Dist. LEXIS 15032, at *11. The plaintiffs there did not contend that defendant's stated revenues or net revenues were false or misleading. *See Id.* Here, however, the admitted falsity of the statements, the extraordinary degree to which they were false, the length of time (covering several years) that the statements were false, and Macchiarulo's and Weissman's access to Holographics' actual sales and revenue information by virtue of their positions within the company, combine to raise a strong inference that Macchiarulo and Weissman engaged in conduct that was either conscious or reckless. This is not a "just a GAAP violation" case. I therefore find that Plaintiffs have met the burden of pleading scienter and pleading facts of the misconduct with particularity.

I also find Plaintiffs have alleged adequately that the material misstatements were the proximate cause of the drop in the stock price. Because they plead under a theory of "fraud on the market" Plaintiffs do not need to plead reliance. *See Basic Inc. v. Levinson,* 485 U.S. 224, 241–42, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988).

## V. *The ABN Complaint*

The ABN Plaintiffs bring two claims: (1) Against ABN, Weissman, Gorman and Gentile for securities fraud in violation of 10(b) of the Exchange Act and SEC Rule 10b–5; and (2) Against Weissman, Gorman and Gentile as "control persons" of ABN under Section 20(a) of the Exchange Act.

ABN and the Individual Defendants move to dismiss the 10(b) claim on the grounds that Plaintiffs inadequately plead facts in support of their claim and that Plaintiffs also fail to plead facts giving rise to a strong inference of scienter as required by Rule 9(b) and the PSLRA. The Individual Defendants move to dismiss the Section 20(a) claim on the ground that the underlying claim against ABN is deficient. In addition, the Individual Defendants argue that, even if the claim against ABN is sufficient to survive the 12(b)(6) motion, the Plaintiffs have failed to allege culpable conduct on the part of the individual officers.

### A. *Section 10(b) Liability*

In the ABN Complaint, Plaintiffs allege that Weissman, Gorman and Gentile, as officers of ABN, had participated in a fraudulent scheme to misstate the financial status of the ABN subsidiary Holographics in order to inflate the value of the Holographics IPO, which in turn would benefit ABN, since the entire proceeds of the IPO went straight into the corporate coffers of ABN. Plaintiffs further allege that the Individual Defendants were insiders who controlled the day-to-day operations of ABN and Holographics; instigated and carried out the improper accounting scheme; and prepared, signed and/or approved the false financial statements that are the subject of the ABN Complaint. (ABN Compl. ¶¶ 12–15, 27, 40–48. 57–65. 74–79, 100, 105, 109–118). They claim that, as a result of the overstatement of Holographics' revenues in ABN's public financial disclosures for 1996 and 1997, the value of ABN's shares dropped during the class period (May 2, 1996 through January 25, 1999) from a high of $6.75 per share to a low of $0.8125 per share.

---

tiffs' allegations that the price was inflated to facilitate company's acquisition of two companies sufficed to plead motive. *Id.* 1999 WL 767418, at *10, 1999 U.S. Dist. LEXIS 15032, at *32. In the Holographics complaint, Plaintiffs allege that the Holographics price was

artificially inflated, *inter alia,* to enable ABN to pay off its 10 3/8% Senior Notes; the Holographics common stock was thus "currency"—for ABN, Holographics and the Individual Defendants.

I find the allegations against ABN and Weissman sufficient as a matter of law for substantially the same reasons stated in my analysis of the 10(b) claims brought against them in the Holographics complaint. The fraudulent scheme alleged here is essentially the same scheme alleged by the Holographics Plaintiffs. Plaintiffs here have adequately pleaded facts showing a strong inference of fraudulent intent based on Weissman's recklessness or conscious misbehavior in misstating the revenues of Holographics—both when it was a subsidiary of ABN and after the IPO—and based on his public statements about the future prospects of both ABN and Holographics. I further find that such misstatements, when combined with the public statements Weissman made on the eve of the IPO, were material to the price of ABN shares. The argument that the misstatements are not material because Holographics represented only 9% of ABN's overall business ignores the key allegation that by inflating the IPO price, ABN would be able to pay off a significant portion of its junk bonds.

The gravamen of the claim against Gorman, Executive Vice President and CFO of ABN, and Gentile, Vice President and Corporate Comptroller of ABN, is that they filed financial statements in violation of GAAP and SEC guidelines as part of a scheme to defraud ABN shareholders. Plaintiffs here fail to allege facts that create a strong inference of fraudulent intent on the part of Gorman or Gentile. As noted above, an allegation of the mere existence of executive incentive compensation is insufficient to plead motive.

Plaintiffs argue in the alternative that they have alleged conscious misbehavior or recklessness on the part of Gorman and Gentile sufficient to create a strong inference of fraud. Plaintiffs allege that, as insiders of ABN, Gorman and Gentile had unique access to the day-to-day operations of the Holographics subsidiary, a subsidiary whose activities were almost entirely indistinguishable from ABN's. (ABN Compl. ¶ 112–118.) They also allege that Gorman signed the 10–Qs and 10–Ks alleged to contain material misstatements, which were filed with the SEC in 1996 and 1997, and that Gentile signed the 10–Qs filed in 1998.

Recognizing the limitations of alleging fraud by hindsight and of basing a 10(b) claim solely on violations of accounting rules, I nonetheless find that Plaintiffs have sufficiently plead recklessness or conscious misbehavior on the part of Gentile and Gorman. Here, as with the Holographics claim, the magnitude of the accounting irregularities removes the actions from the sphere of mere corporate mismanagement to the realm of reckless behavior. As the Comptroller and CFO of ABN respectively, Gentile and Gorman were, as Plaintiffs allege, uniquely situated to control the revenue recognition procedures of ABN. That revenues were radically inflated over a period of two years, and in repeated 10–Q and 10–K filings with the SEC, is circumstantial evidence of recklessness giving rise to a strong inference of fraud. I conclude that it would be error to dismiss the Complaint prematurely against Gorman and Gentile.

I therefore deny the motion to dismiss the claims against Weissman, Gentile and Gorman.

B. *Control Person Liability under Section 20(A)*

In order to survive a motion to dismiss a claim under Section 20(a), "plaintiffs must allege (1) an underlying primary violation by the controlled person; (2) control [by the defendant] over the culpable participation in the fraud perpetrated by the controlled person; and (3) particularized facts as to the controlling person's culpable participation in the fraud." *Ellison* 36 F.Supp.2d at 637. *See also Novak*, 26 F.Supp.2d at 662–63. The first two prongs are satisfied, as Plaintiffs have alleged an underlying primary violation by ABN, and Weissman, Gentile and Gorman each "had the power to control or influ-

ence, directly or indirectly, the corporation or its management." *Jacobs*, 1999 WL 101772, at *17, 1999 U.S.Dist. LEXIS 2102 at *49.

Weissman, Gentile and Gorman argue that Plaintiffs have not met the third prong because they have failed to plead any facts demonstrating their culpable participation in ABN's acts. By pleading that the Individual Defendants engaged in specific conduct while serving as Chairman and CEO, Executive Vice President and Corporate Comptroller, respectively, of ABN throughout the Class Period, the Plaintiffs have alleged particularized facts that give rise to a strong inference not only of the power to direct and control the culpable acts of ABN, but also participation in those acts.

For the foregoing reasons, the ABN Defendants motion to dismiss the ABN Complaint is denied.

This constitutes the decision and order of the Court.