### In re FLAG TELECOM HOLDINGS, LTD. SECURITIES LITIGATION

**This Document Relates to: All Actions**

**No. 02 CIV. 3400(WCC).**

United States District Court, S.D. New York.

Feb. 25, 2004.

Milberg Weiss Bershad Hynes & Lerach LLP, Lead Counsel for Plaintiff and the Class, New York, NY, Brad N. Friedman, Esq., Rachel S. Fleishman, Esq., Elizabeth A. Berney, Esq., Alisha C. Smith, Esq., Of Counsel.

Kirkland & Ellis LLP, New York, NY, Joseph Serino, Jr., Esq., Eric F. Leon, Esq., Of Counsel, Kirkland & Ellis LLP, Washington, D.C., Thomas D. Yannucci, P.C., Craig S. Primis, Esq., Matthew E. Papez, Esq., Of Counsel, for Defendant Verizon Communications Inc.

Clifford Chance U.S. LLP, Attorneys for Defendant Citigroup Global Markets, Inc., New York, NY, James N. Benedict, Esq., Michael D. Torpey, Esq., Scott W. Reynolds, Esq., Margaret Snyder, Esq., Joseph Floriani, Esq., Stacey Becker, Esq., Of Counsel.

Shearman & Sterling, Attorneys for Defendant Flag Telecom Group Limited and Individual Defendants Andres Bande, Larry Bautista, Andrew Evans, Lim Lek Suan, Edward McCormack, Edward McQuaid, Daniel Petri and Philip Seskin, New York, NY, Jerome S. Fortinsky, Esq., Paul S. Hessler, Esq., Tammy P. Bieber, Esq., Of Counsel.

## *OPINION AND ORDER*

WILLIAM C. CONNER, Senior District Judge.

Plaintiff Peter T. Loftin brings this putative class action against defendants Flag Telecom Holding Group, Ltd. ("Flag"),[1] Salomon Smith Barney, Inc. n/k/a Citigroup Global Markets, Inc. ("Citigroup" or the "underwriter") and Verizon Communications, Inc. ("Verizon"). Plaintiff also names eight individual defendants: Andres Bande, Larry Bautista, Andrew Evans, Dr. Lim Lek Suan, Edward McCormack, Edward McQuaid, Daniel Petri and Philip Seskin (collectively referred to as the "individual defendants").[2] On October 18, 2002, this Court consolidated several similar suits; Loftin was named lead plaintiff and Milberg Weiss Bershad Hynes & Lerach was appointed lead counsel.

Plaintiff alleges that all defendants are liable under §§ 11, 12(a)(2) and 15 of the Securities Act of 1933 (the "Securities Act"). Additionally, plaintiff claims that Flag and the individual defendants violated § 10(b) of the Securities and Exchange Act of 1934 (the "Exchange Act") and Rule 10b–5 promulgated thereunder. Flag, Verizon, Citigroup and the individual defendants move to dismiss pursuant to Rules 12(b)(6) and 9(b) and the Private Securities Litigation Reform Act ("PSLRA") for failure to state a claim. For the reasons stated herein, defendants' motions are granted. Plaintiff, however, is granted leave to replead all claims. Accordingly, plaintiff has thirty days from the entry of this Opinion and Order to file a Second Consolidated Amended Complaint.

## BACKGROUND

Prior to filing its Chapter 11 bankruptcy petition,[3] Flag was a telecommunications company, co-founded by Verizon's predecessor, (Complt.¶ 52),[4] that marketed itself as a "carrier's carrier" i.e. a company that owns its own telecommunications infrastructure and sells access to it on a wholesale basis. (*Id.* ¶ 2.) Each of the individual defendants served as officers or directors of Flag during the class period. Specifically, Bande was the Chairman and Chief Executive Officer ("CEO"), McCormack was the Chief Operating Officer ("COO"), Evans was the Chief Technology Officer, Bautista was the Chief Financial Officer ("CFO") and Petri, McQuaid, Seskin and Suan were directors.

In early 2000, Flag made an initial public offering ("IPO") as part of an effort to expand its fiberoptic network. (*Id.* at

---

1. Flag Telecom Group Limited ("FTGL") was initially named as defendant. The parties stipulated to the substitution of Flag as defendant and plaintiff filed a Second Corrected Consolidated Amended Complaint ("Complaint"). Accordingly, we will treat FTGL's motion to dismiss as if it was filed by Flag.

2. Plaintiff also names as defendants Stuart Rubin, Abdul Latf Ghurab, Adnan Omar, Umberto Silvestri, Jonathan Soloman, Fumio Uehara and Dr. Vilmolvanich Vallobh. Plaintiff does not dispute that these parties have not been served in this action. (Indiv. Defs. Corr. Mem. Supp. Mot. Dismiss at 1 n. 1; Pl. Mem. Opp. Indiv. Defs. Mot. Dismiss at 1.) Accordingly, the claims against these defendants are dismissed.

3. Flag filed a voluntary Chapter 11 petition under the Bankruptcy Code on April 12, 2002. (Complt.¶ 172.) FTGL emerged from the reorganization on October 10, 2002, as successor to Flag: (*Id.* ¶ 43.) On this point, contrary to Flag's assertion, nothing in Flag's Bankruptcy Plan prohibits plaintiff from pursuing his claims against Flag in this Court although recovery will be limited to the amount of any insurance proceeds. (Fortinsky Decl., Ex. B ¶ 3(e).)

4. All references herein to the Complaint are to the Second Corrected Consolidated Amended Complaint. For the purposes of this motion we must assume that the allegations in the Complaint are true.

¶¶ 3–4; Prospectus at 15.) One of the largest projects disclosed in the Prospectus was a joint venture with GTS TransAtlantic ("GTS"). The companies were constructing a fiberoptic connection between London and Paris called the Flag Atlantic–1 system ("FA–1 system"). (Complt. at ¶ 4.) Flag also intended to develop its network by acquiring access to cables owned by other carriers where rapid expansion was necessary or where it was not economically feasible to expand Flag's own infrastructure. (Prospectus at 1, 38.) In industry jargon, such unused cables are called "dark fiber."

On January 18, 2000, Flag filed a Registration Statement that incorporated the company's Prospectus. (Complt.¶ 70.) The effective date of the Registration Statement was February 11, 2000. (Id. ¶ 74.) Flag's IPO took place on February 16, 2000, and the company raised approximately $634.6 million from the sale of its common stock. (Id.) Citigroup served as lead underwriter. (Id. ¶ 52.) Plaintiff alleges that the Prospectus contained actionable misstatements because it created "the false and misleading impression that strong demand existed for Flag's capacity, and that demand was growing." (Id. ¶ 70.) Plaintiff also claims that the Prospectus contained actionable omissions. (Id. ¶¶ 70–72.)

Sometime after the IPO, the telecommunications industry experienced a decline and in late 2000 and early 2001, some of Flag's competitors began to reduce forecasts and announce liquidity problems. (Id. ¶ 64.) Plaintiff claims that rather than disclose the fact that Flag was also experiencing difficulties, Flag relied on improper "swap" transactions with competitors to inflate its financial results and made misleading, or incomplete, public statements to create the sense that Flag was not suffering the same fate as some of its competitors. (Id. at ¶ 2.) The alleged misleading statements continued until Flag's announcement on February 13, 2002 that the company was "reviewing [its] business in light of deteriorating market conditions" and that 14% of its revenues for 2001 were the result of reciprocal transactions entered into with competitors. (Id. ¶ 153.) Plaintiff proposes a Class Period from February 16, 2000, the date of Flag's IPO, until February 13, 2002, the date of Flag's announcement that it was "reviewing its business."

## DISCUSSION

### I. Standard of Review

On a motion to dismiss pursuant to Rule 12(b)(6), the court must accept as true all of the well pleaded facts and consider those facts in the light most favorable to the plaintiff. See Scheuer v. Rhodes, 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974), overruled on other grounds by Davis v. Scherer, 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984); Harris v. City of New York, 186 F.3d 243, 247 (2d Cir.1999); Faulkner v. Verizon Communications, Inc., 156 F.Supp.2d 384, 390 (S.D.N.Y.2001) (Conner, J.). On such a motion, the issue is "whether the claimant is entitled to offer evidence to support the claims." Scheuer, 416 U.S. at 236, 94 S.Ct. 1683. A complaint should not be dismissed for failure to state a claim "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Padavan v. United States, 82 F.3d 23, 26 (2d Cir.1996) (quoting Hughes v. Rowe, 449 U.S. 5, 10, 101 S.Ct. 173, 66 L.Ed.2d 163 (1980)). Generally, "[c]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." 2 JAMES WM. MOORE ET. AL., MOORE'S FEDERAL PRACTICE § 12.34[1][b] (3d ed.1997); see also Hirsch v. Arthur Andersen & Co., 72 F.3d 1085,

1088 (2d Cir.1995). Allegations that are so conclusory that they fail to give notice of the basic events and circumstances of which the plaintiff complains, are insufficient as a matter of law. *See Martin v. New York State Dep't of Mental Hygiene*, 588 F.2d 371, 372 (2d Cir.1978).

In assessing the legal sufficiency of a claim, the court may consider those facts alleged in the complaint, documents attached as an exhibit thereto or incorporated by reference, *see* FED. R. CIV. P. 10(c); *De Jesus v. Sears, Roebuck & Co., Inc.*, 87 F.3d 65, 69 (2d Cir.1996), and documents that are "integral" to plaintiff's claims, even if not explicitly incorporated by reference. *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 46–48 (2d Cir.1991). A company's prospectus is integral to a plaintiff's § 11 and § 10(b) claims and can be considered in its entirety even where plaintiff has quoted from it sparingly. *I. Meyer Pincus & Assocs. v. Oppenheimer & Co.*, 936 F.2d 759, 762 (2d Cir.1991). Indeed, when considering a motion to dismiss § 11 claims, the court must consider the prospectus as a whole. *Olkey v. Hyperion*, 98 F.3d 2, 5 (2d Cir.1996).

## II. *Plaintiff's Securities Act Claims*

### A. *Section 11*

■ Plaintiff has asserted a claim under § 11 of the Securities Act against all named defendants. (Complt.¶¶ 198–206.) In order to state a claim under § 11, a plaintiff must allege that "the registration statement … contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading …." 15 U.S.C. § 77k(a). The truth of a statement made in the prospectus is adjudged by the facts as they existed when the registration statement became effective. *In re MobileMedia Sec. Litig.*, 28 F.Supp.2d 901, 923 (D.N.J.1998). A claim under this section may be asserted against every person who signed the registration statement, the directors of the issuer and the underwriter of the security. 15 U.S.C. § 77k(a). The test for determining whether the prospectus contained material misstatements or omissions is "whether the defendants' representations [made in the prospectus], taken together and in context, would have misled a reasonable investor …." *Olkey*, 98 F.3d at 5.

■ Plaintiff attempts to plead a § 11 claim by alleging the following:

> The Prospectus touted Flag's supposedly "state-of-the-art technology" and the vast capacity of its largest project, the FA–1 system. In particular, the Prospectus went to great lengths to create the false and misleading impression that strong demand existed for Flag's capacity, and that demand was growing …. [Flag also] promoted the fact that the FA–1 system had "pre-sales in excess of $750 million," but failed to disclose that every customer who was likely to purchase capacity on the FA–1 had already done so.

(Complt.¶¶ 70–71.) Plaintiff argues that these statements were misleading because "a glut of supply existed that was overwhelming demand and driving down prices" and the statements created the "misleading impression that strong demand existed for Flag's capacity." (*Id.* ¶¶ 70–74.) Plaintiff further claims that the Prospectus was misleading because it "touted" Flag's customer base without disclosing that "Flag performed absolutely no due diligence on its customers to determine their ability to pay." (*Id.* ¶ 72.)

None of the statements in the Prospectus constitutes an affirmative representation by Flag that "strong demand existed for Flag's capacity, and that demand was growing …." (*Id.* ¶ 70.) For instance, Flag stated that a particular feature of its

FA–1 system was "designed to meet the needs of major global carriers that require substantial amounts of bandwidth." (Prospectus at 38.) This statement merely indicates that Flag sought to attract major global carriers that required facilities Flag offered, not that demand for Flag's capacity was strong. While Flag announced that the FA–1 system had pre-sales of $750 million, it did not, as plaintiff claims, present this fact in an effort to exaggerate the demand for Flag's products. In fact, the statement appeared in a section of the Prospectus explaining how the project would be financed. (Prospectus at 34.) Similarly, plaintiff points to Flag's contention that "carriers have responded positively to our ability to offer" certain facilities and services. (*Id.* at 40.) This statement is far too vague to lead a reasonable investor to conclude that at the time of the offering Flag claimed that demand was strong for its capacity.

Plaintiff has established that Flag represented that there was a general demand for capacity in the telecom industry and that Flag expected to "participate in ... important growth and strategic shifts in the international telecommunications markets." (Prospectus at 39.) Most of these representations consist of statements made by Flag concerning general market conditions and trends. (Pl. Mem. Opp. Citigroup Mot. Dismiss at 3–4.) Plaintiff has not, however, pleaded any facts that indicate any of these statements were untrue as of the effective date. In fact, the Complaint tends to establish that the decline in the telecom industry did not begin until late 2000 and early 2001. (Complt. ¶¶ 64–65.) The Prospectus also contained meaningful cautionary language explaining that the telecom industry faced significant challenges. Flag disclosed that it faced "competition and pricing pressure from existing cables, planned cables, and satellite providers." (Prospectus at 11.) Flag even predicted that prices would decline going forward. (*Id.* at 31.) The company explained that many of its competitors had greater resources and that advances in technology could lead to an increase in its competitors' capacity. (*Id.* at 11.) Furthermore, Flag frankly stated that ventures, such as its FA–1 system, that employed "state of the art technology" were subject to deployment problems that could have a material adverse effect. (*Id.* at 6–14.) Far from brashly "touting" its "state of the art technology" as plaintiff claims, Flag was singling out its "state of the art technology" a significant risk factor. When a prospectus contains detailed disclosures of the relevant risks involved, general statements concerning the state of the industry, such as the ones made here, are immaterial as a matter of law. *See Olkey*, 98 F.3d at 6.

Plaintiff has also failed to plead an omission that will support liability under § 11. When a plaintiff claims that the defendant failed to disclose information in a prospectus, the plaintiff must plead facts demonstrating the defendant possessed the omitted information when the registration statement became effective and that the defendant had a duty to disclose that information. *See, e.g., Scibelli v. Roth*, No. 98 Civ. 7228, 2000 WL 122193, at *3 (S.D.N.Y. Jan.31, 2000) (dismissing a § 11 claim when it was alleged that the defendant failed to disclose demand was weak because the plaintiff did not plead facts demonstrating that the defendant possessed information indicating that demand was weak on the effective date); *Fisher v. Ross*, No. 93 Civ. 0275 (JGK), 1996 WL 586345, at *3 (S.D.N.Y. Oct.11, 1996).

In the present case, plaintiff alleges that Flag had a duty to disclose that "a glut of supply existed that was overwhelming demand and driving down prices." (Complt. ¶¶ 70–74.) This allegation fails because plaintiff does not claim that this was true

as of the effective date much less allege that Flag possessed information indicating that demand was weak on the effective date. In fact, the Complaint tends to show that demand for telecom products did not weaken until long after the IPO, (*id.* ¶¶ 64–65), and the Prospectus disclosed in detail the competitive challenges facing Flag. Plaintiff also alleges that Flag's claim that it had "pre-sales in excess of $750 million" on its FA–1 system gave rise to a duty to disclose that all the customers who were likely to purchase capacity on that network had already done so. (*Id.* ¶ 71.) Even if this were the case, plaintiff has not pleaded facts indicating that on the effective date Flag had information that would lead to this conclusion.

The Prospectus also contained statements concerning Flag's customer base. For example, Flag stated, "We have an established customer base of approximately 90 customers." (Prospectus at 44.) Plaintiff does not allege that Flag misrepresented its customer base. Instead, he claims that Flag had a duty to disclose that it performed no due diligence on its customers because Flag "touted" its customer base in the Prospectus. The only allegation that plaintiff provides to support this claim is that an unnamed former Finance Manager said that "when selling capacity, Flag 'just wanted to record the sale.'" (Complt. ¶ 72 (quoting former Finance Manager).) This vague statement does not indicate that Flag failed to conduct due diligence; it merely states the Manager's interpretation of Flag's desire. Indeed, the Complaint tends to establish that Flag did in fact conduct due diligence. First, it notes that Barclays Bank agreed to provide financing for the FA–1 system project (*id.* ¶ 112); if a bank was willing to provide substantial funding, it is unlikely that Flag had no idea whether its customers had the ability to pay. Second, the Prospectus states that 95% of Flag's reported revenues came from its top fifty customers. (Prospectus at 52.) This suggests that Flag had dealt with its customers in the past and was therefore assured of their ability to pay. Therefore, this allegation fails because plaintiff has not alleged any facts to indicate that Flag failed to adequately investigate its customers' ability to pay. Accordingly, we conclude that plaintiff has failed to plead an actionable omission under § 11.

Because plaintiff has failed to plead facts showing that "the registration statement ... contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading," his § 11 claims must be dismissed. 15 U.S.C. § 77k(a). The individual defendants argue that these claims should also be dismissed because they are time barred. (Indiv. Defs. Corr. Mem. Supp. Mot. Dismiss at 32.) However, accepting the allegations in the Complaint as true, it is not clear at this point that plaintiff should have discovered the allegedly misleading statements prior to the end of the Class Period. Therefore, we cannot say, as a matter of law, that plaintiff was put on inquiry notice so as to trigger the one-year statute of limitations prior to that time. *See* 15 U.S.C. § 77m.

## B. *Section 12(a)(2) and Section 15*

■ Plaintiff has asserted a claim under § 12(a)(2) of the Securities Act against Flag, the individual defendants and Citigroup. (Complt. ¶¶ 207–14.) Section 12(a)(2) allows a plaintiff to proceed against "[a]ny person who .... offers or sells a security ... by means of a prospectus or oral communication, which includes an untrue statement of material fact or omits to state a material fact necessary in order to make the statements ... not misleading ...." 15 U.S.C. § 77*l*(a). The Supreme Court has held that a private con-

tract for sale is not a "prospectus" under this provision, *Gustafson v. Alloyd Co.*, 513 U.S. 561, 571, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995). The predominant view is that under this precedent § 12(a)(2) applies only to public offerings and therefore aftermarket purchasers lack standing to bring a claim under § 12(a)(2). *See, e.g., Laser Mortgage Mgmt., Inc. v. Asset Securitization Corp.*, No. 00 Civ. 8100 (NRB), 2001 WL 1029407, at *7–8 (S.D.N.Y. Aug.17, 2001); *Waltree Ltd. v. ING Furman Selz LLC*, 97 F.Supp.2d 464, 469 (S.D.N.Y.2000). However, a party named "lead plaintiff" under the PSLRA need not have standing to sue on each individual claim asserted in the complaint so long as other named plaintiffs have standing to pursue the claims at issue. *In re Initial Public Offering Sec. Litig.*, 214 F.R.D. 117, 123 (S.D.N.Y.2002); *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 451 (S.D.Tex. 2002); *In re American Bank Note Holographics Inc. Sec. Litig.*, 93 F.Supp.2d 424, 436 (S.D.N.Y.2000) (*"Holographics"*). Nevertheless, plaintiff's § 12(a)(2) claims must be dismissed for two other reasons: first, as discussed *supra* in Part II.A., the Complaint fails to plead that the Prospectus contained any actionable misstatements or omissions. Second, plaintiff has not alleged that any of the named plaintiffs purchased securities in the IPO and has thus failed to allege that any of them has standing to pursue this claim.

Finally, plaintiff asserts a claim under § 15 of the Exchange Act against Verizon and the individual defendants. (Complt. ¶¶ 215–18.) Section 15 of the Securities Act allows a plaintiff to proceed against "[e]very person who, by or through stock ownership, agency or otherwise ... controls any persons liable under section 11 or 12" of the Securities Act. 15 U.S.C. § 77*o*. These claims must be dismissed because, as discussed above, plaintiff has failed to plead any violation under the Securities Act.

### III. *Plaintiff's Exchange Act Claims*

Plaintiff asserts claims against Flag and the individual defendants under § 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. Section 10(b) provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange ...
>
> (b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 states:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,
>
> (a) To employ any device, scheme or artifice to defraud,
>
> (b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or
>
> (c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5.

To state a prima facie case for securities fraud under these provisions a

plaintiff must show that " 'in connection with the purchase or sale of securities' " the defendant: (1) made a false representation of material fact or omitted to disclose material information that the defendant had a duty to disclose; (2) acted with scienter; and (3) " 'that plaintiff's reliance on defendant's action caused [plaintiff] injury.' " *Suez Equity Investors, L.P. v. Toronto Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001) (quoting *Press v. Chemical Inv. Servs. Corp.*, 166 F.3d 529, 534 (2d Cir.1999)) (alterations in original).

■ Securities fraud actions are subject to the pleading requirements of FED. R. CIV. P. 9(b). Rule 9(b) requires that "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." To satisfy this requirement, "a complaint 'must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent.' " *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir.1999) (quoting *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 51 (2d Cir.1995)).

A plaintiff who alleges securities fraud under § 10(b) and Rule 10(b)(5) must also satisfy the heightened pleading standards of the PSLRA. *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir.2000). In order to plead a material misrepresentation or omission under the PSLRA "the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information or belief, the complaint shall state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). The PSLRA further requires the plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the requisite state of mind." 15 U.S.C. § 78u–4(b)(2).

■ As stated above, the requisite state of mind under § 10(b) and Rule 10b–5 is scienter. *Suez Equity Investors*, 250 F.3d at 95. A plaintiff may establish a "strong inference" of scienter by pleading facts: (1) that demonstrate the defendants had both the motive and opportunity to commit fraud; or (2) that "constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Rothman v. Gregor*, 220 F.3d 81, 90 (2d Cir.2000). Motive and opportunity are established if the plaintiff alleges " 'concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged' " and that the defendant had the means necessary to profit from the alleged fraud. *Novak*, 216 F.3d at 307 (quoting *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1130 (2d Cir.1994)). Typically, the pleading of motive and opportunity is sufficient when a plaintiff alleges that corporate insiders made materially misleading statements while selling off large amounts of stock at artificially high prices. *Novak*, 216 F.3d at 308. Facts demonstrating conscious misbehavior are sufficient to establish a strong inference where they show intentional misconduct. For example, a plaintiff may establish a strong inference of scienter when he or she pleads that an insider defendant traded on undisclosed inside information. *Id.* The standard for pleading scienter on the basis of reckless conduct is not as well defined. The Second Circuit has noted that

> securities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements. Under such circumstances, defendants knew or, more im-

portantly, should have known that they were misrepresenting material facts related to the corporation.

*Id.* at 308. In light of these principles, the court in *Novak* indicated that there are generally four ways a plaintiff may successfully plead scienter under Second Circuit precedent.

> [T]he inference may arise where the complaint sufficiently alleges that the defendants: (1) benefitted in a concrete and personal way from the purported fraud ...; (2) engaged in deliberately illegal behavior ...; (3) knew facts or had access to information suggesting that their public statements were not accurate ...; or (4) failed to check information they had a duty to monitor ....

*Id.* at 311 (internal citations omitted). The court cautioned that while reckless conduct may give rise to a strong inference of scienter, "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them." *Id.* at 309. Furthermore, allegations establishing a violation of Generally Accepted Accounting Principles ("GAAP"), standing alone, are insufficient to establish a strong inference of scienter. *Id.*

In the present case, plaintiff has generally alleged that Flag and the individual defendants made three categories of misleading statements. First, Flag's financial statements during the Class Period were misleading because the company relied on improper swap transactions that falsely inflated revenues and violated GAAP. Second, the company and management represented demand was strong for Flag's capacity when in fact "a glut of supply existed that was overwhelming demand and driving down prices." (Complt.¶¶ 75, 78, 83, 89, 94, 100, 104, 108, 138, 143, 147.) Third, Flag represented that the FA–1 system was on

schedule when in fact it was not. Although these allegations arguably satisfy the first requirement of a fraud pleading—a false statement or a misleading omission of a material fact—they clearly fail to satisfy the second requirement by pleading facts that give rise to a strong inference of scienter.

## A. The Allegedly Misleading Statements and Whether Flag or the Individual Defendants Knew or Should Have Known They Were Misleading

Plaintiff attempts to plead scienter in this case in part by alleging that Flag or the individual defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak,* 216 F.3d at 311. In such situations, the scienter analysis and the determination of whether the defendant made false or misleading statements are essentially combined. *Rothman,* 220 F.3d at 90 (if the plaintiff has "sufficiently pled facts to support scienter, they have also met the pleading requirements for false representation or omission."). Stated differently, if the plaintiff presents facts showing that the defendants knew or should have known their statements were false or misleading, the plaintiff has demonstrated that the statements were false or misleading. Similarly, if there is no indication that the statements were false, the plaintiff cannot show that the defendants knew the statements were false. Therefore, we will consider each category of misstatement and determine whether plaintiff has pleaded facts demonstrating that the statement or omission was false or misleading and that Flag and the individual defendants had access to information indicating that it was.

In making this determination, the Court is guided by the Second Circuit's

instruction that "[a]lthough speculation and conclusory allegations will not suffice, neither do we require 'great specificity' provided the plaintiff alleges enough facts to support 'a strong inference of fraudulent intent.'" *Ganino v. Citizens Util. Co.*, 228 F.3d 154, 169 (2d Cir.2000). Therefore, "a plaintiff need not plead dates, times and places with absolute precision . . . ." *Int'l Motor Sports Group, Inc. v. Gordon*, No. 98 Civ: 5611 (MBM), 1999 WL 619633, at *3 (S.D.N.Y. Aug.16, 1999). Allegations of scienter and falsity will be sufficient where "the sources of the information and the information itself are described in detail . . . ." *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 417 (S.D.N.Y.2003).

### 1. *The Swap Transactions*

 Plaintiff has identified as misleading statements made by Flag in press releases and SEC filings regarding its financial statements for FY:99, 1Q:00, 2Q:00, 3Q:00, FY:00, 1Q:01, 2Q:01 and 3Q:01. (Complt.¶¶ 80, 83, 89, 94, 100, 108, 138, 143, 147.) Plaintiff alleges that these statements were misleading because Flag entered into improper swap transactions that inflated revenues to give the appearance that the company was succeeding when in fact it was floundering and because the company reported revenues in violation of GAAP. *Id.* These allegations of improper reciprocal transactions are the heart of plaintiff's Complaint to which most of his allegations of false or misleading statements and scienter are tied. Unfortunately for plaintiff, these allegations fail because plaintiff has not pleaded facts that indicate any of the transactions Flag entered into with its competitors were improper. Therefore, plaintiff has failed to plead facts that demonstrate that Flag or the individual defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak,* 216 F.3d at 311.

The first swap transaction plaintiff identifies occurred sometime in March 2001. Plaintiff cites a March 23, 2001 press release wherein Flag announced a sale of dark fiber on its transoceanic cable system to KPNQwest. (Complt.¶ 118.) Flag did not disclose the details of the transaction but did describe it as a "multi-million dollar transaction." (*Id.*) On March 29, 2001 Flag and KPNQwest jointly issued another press release announcing Flag's purchase of dark fiber capacity and collocation facilities from KPNQwest on KPNQwest's pan-European network. (*Id.* ¶ 119.) Again, the terms of the deal were not disclosed but it was described as a "multi-million dollar transaction." (*Id.*)

The second reciprocal transaction occurred sometime in late March or early April of 2001. Plaintiff cites an April 5, 2001 press release wherein Flag announced a collaboration with Verizon, Flag's largest shareholder and a defendant here. (*Id.* ¶ 121.) In the release, Flag stated that it would sell European dark fiber and collocation facilities to Verizon. Verizon would in turn own and operate a European "city-to-city backbone network" upon which Flag would "provide and manage its own IP layer and collocation space for its customers." (*Id.*)

The last swap transaction that plaintiff specifically identifies allegedly occurred sometime during 2Q:01. Plaintiff cites the Consolidated Amended Complaint filed in *In re Global Crossing, Ltd. Sec. Litig.*, 02 Civ. 910(GEL). In the *Global Crossing* complaint, the plaintiffs alleged that Global Crossing entered into a $32.5 million swap with Flag and cited another complaint filed in a related action by a former Global Crossing executive. (*Id.* ¶ 123.)

In a press release issued at the end of the Class Period Flag stated, "Approximately 14% of GAAP revenues for the full year 2001 was associated with other tele-

communications companies and service providers ......" Plaintiff contends that this admission "stunned the market," (*id.* ¶ 29), and demonstrates that Flag improperly inflated revenues by 14%. (Pl. Mem. Opp. Indiv. Defs. Mot. Dismiss at 6.) We disagree. This statement does not establish that revenues were overstated because there is nothing inherently wrong with reciprocal transactions. If Flag had to restate revenues by 14% as a result of the fact that it improperly accounted for reciprocal transactions, then plaintiff would have established that Flag's financial statements were false and plaintiff would have alleged a fact that would raise an inference of scienter. *See In re Revlon, Inc. Sec. Litig.*, No. 99 Civ. 10192(SHS), 2001 WL 293820, at *3–4, 7–8 (S.D.N.Y. Mar. 27, 2001), 2001 U.S. Dist. LEXIS 3265, at *9–10, 20. However, this is not the case here.[5]

Without any indication that revenues were overstated as a direct result of the reciprocal transactions, plaintiff's task of pleading scienter becomes more difficult. In order to show that the swap transactions at issue were entered into for the sole purpose of creating revenues and boosting cash flow or earnings before interest, taxes, depreciation and amortization ("EBITDA"), plaintiff notes Flag's former Director of Sales stated that he and other employees had "personally questioned ... the 'ethical boundaries' " of the swap transactions, but the Complaint does not identify the specific transactions to which the former Director was referring. (*Id.* ¶ 126.) The Director also stated that the unspecified swap transactions were "end-of-the-quarter transactions" and occurred at a time when Flag was struggling to meet earnings projections. These statements made by the Director are simply too vague to establish that Flag or the individual defendants "knew facts or had access to information suggesting that" the swap transactions at issue were sham transactions entered into in order to artificially inflate revenues and EBITDA. *Novak*, 216 F.3d at 311. The statements made by the former Sales Support Engineer are more pertinent, but are still insufficient to establish that Flag acted with scienter. According to plaintiff, the Engineer stated that "management" informed personnel in the Provisioning Division that they did not have to "worry about actually having to deliver the capacity [as required by the alleged swap agreements] because the 'other side' did not care whether the capacity was actually ever delivered." (Complt. ¶ 127.) While this suggests that the swap transactions at issue were a sham, the Engineer does not state whether the transactions specifically identified by plaintiff were improper nor does the Engineer identify the transaction to which he or she was referring. Furthermore, the Engineer's statement does not indicate that Flag was purchasing capacity it never intended to use; it only indicates that Flag's competitors were doing so.

The only allegation in the Complaint that even attempts to establish that Flag knew, or should have known, that a specific transaction was improper is plaintiff's allegation that "[a]ccording to a former FLAG Network Planner, the swap transaction between Verizon and Flag was done for the purpose of artificially creating revenue for both companies." (*Id.* at ¶ 122.) This allegation is far too conclusory to establish that Flag or the individual defendants knew or had facts available that should have alerted them to the fact that

---

5. That is not to say the allegation is of no use to plaintiff. If plaintiff could plead facts showing that Flag entered into swap transactions to artificially inflate revenues, Flag's statement that 14% of its revenues were the result of these transactions would be a sufficient pleading of material falsity and scienter.

the transaction at issue was fraudulent. First, plaintiff has failed to state the Network Planner's basis of knowledge of this information—while it would not be impossible for the Network Planner to possess this information, it is not apparent from the informant's title that he or she would probably possess such information. *See Novak,* 216 F.3d at 314 (holding that reliance on confidential sources in the complaint is permissible but the sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged.") Second, the Network Planner's statement does not establish a direct link between Flag and an allegedly improper swap transaction because it is unclear whether the transaction to which the Network Planner was referring was the same transaction between Verizon and Flag that was specifically identified in the Complaint.

Since these allegations are insufficient, plaintiff is left with what is essentially a "guilt by association" argument. Plaintiff cites several articles discussing swap transactions entered into between unnamed telecom competitors to artificially inflate each company's revenues, (Complt. ¶¶ 10–12, 14), and offers statements made by an industry insider and former chief accountant of the SEC that acknowledge such improper swap transactions were a serious issue in the telecom industry. (*Id.* ¶ 15.) Plaintiff also alleges a link between Flag and certain telecommunications companies that are alleged to have been involved in serious misconduct. (*Id.* ¶ 125.) Notably, plaintiff cites the allegation in the *Global Crossing* Complaint that Global Crossing entered into an improper swap transaction with Flag supposedly worth $32.5 million. (*Id.* ¶ 123.) The Complaint also outlines the Congressional testimony of Global Crossing's former President of Carrier Sales. His statement indicates that when Global Crossing needed to meet revenue targets, competitors would aid the company by increasing the size of an existing swap with Global Crossing and Global Crossing would reciprocate. (*Id.* ¶ 124.) The former President also indicates that Flag had been involved in such a deal.

None of these statements represents that Flag entered into a single swap transaction without the intention of using the capacity acquired from its competitor. *Cf. Revlon,* 2001 WL 293820, at *2, 8, 2001 U.S. Dist LEXIS 3265, at *4, 22 (holding that the plaintiffs adequately pled facts establishing a strong inference of scienter where they alleged, *inter alia,* that Revlon shipped a large order to Wal–Mart well in advance of the delivery date in order to book revenues early). Instead, they indicate that some telecom companies were involved in fraudulent swaps and that Flag was on the other side of an allegedly improper swap. While these allegations may give rise to the inference that many telecom companies, including Flag, were involved in questionable swap transactions, more is required to plead securities fraud. *See Stern v. Leucadia Nat'l Corp.,* 844 F.2d 997, 1004 (2d Cir.1988) ("It is not enough to quote press speculation about defendants' motives and press reports of other occasions on which . . . [defendants] obtained greenmail from other corporate targets."); *In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig.,* 273 F.Supp.2d 351, 374 (S.D.N.Y.2003) (a plaintiff cannot establish falsity or scienter merely by quoting press speculation or the conclusions expressed in ex parte regulatory proceedings by those outside the company). The PSLRA requires that plaintiff plead facts that establish a strong inference of scienter. Plaintiff has failed to allege that Flag or the individual defendants acted with a conscious intent to defraud or even that Flag entered into any specific transaction merely to boost revenues and EBITDA. Likewise, plaintiff

has failed to plead facts demonstrating recklessness or that Flag or the individual defendants "knew facts or had access to information suggesting that" the swap transactions at issue were improper. *Novak,* 216 F.3d at 311.

### 2. *Alleged Violations of GAAP and Regulation S–K*

Plaintiff argues that Flag's "GAAP violations, coupled with the other evidence ... support a strong inference of scienter." (Pl. Mem. Opp. Indiv. Defs. Mot. Dismiss at 22.) While evidence of GAAP violations will support an inference of scienter, *SEC v. DCI Telecomms., Inc.,* 122 F.Supp.2d 495, 500 (S.D.N.Y.2000), allegations of violations of GAAP are not enough, without more, to create a strong inference of scienter. *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 270 (2d Cir.1996). Similarly, even if a plaintiff properly alleges a violation of Item 303 of Regulation S–K, such a violation cannot alone create a § 10(b) violation. *In re Quintel Entm't Inc. Sec. Litig.,* 72 F.Supp.2d 283, 293 (S.D.N.Y.1999) (Conner, J.) (citing *In re Sofamor Danek Group, Inc.,* 123 F.3d 394, 402 (6th Cir.1997)). We conclude that although plaintiff has adequately pled a GAAP violation, this allegation is insufficient to raise the requisite strong inference of scienter.

The Complaint alleges that Flag not only engaged in swap transactions for an improper purpose, it also accounted for them in violation of GAAP. (Complt.¶¶ 16–19.) Plaintiff cites Accounting Principles Board Opinion No. 29 ("APB 29") which requires that exchanges of non-monetary assets be accounted for by calculating the fair value of the asset given up or the asset received, whichever is more readily determinable. (*Id.* ¶ 17.) Pursuant to this rule, " 'fair value should be regarded as not determinable within reasonable limits if major uncertainties exist about the realizability of the value ....' " (*Id.* quoting APB 29.) There are exceptions to APB 29. For instance, book value is to be used if the asset given up or received is inventory that is sold in the same line of business or if the exchange is for another similar productive asset. (*Id.* ¶ 18.)

Under APB 29, plaintiff contends, Flag was required to account for the network capacity swap transactions using book value because: (1) the swap involved exchanges of similar productive assets; and (2) the fair value of the assets exchanged were not determinable. The individual defendants argue that the accounting method for these types of transactions remained unsettled until the SEC published a Position Paper on the subject on August 2, 2002 and plaintiff has therefore failed to allege a material misstatement. (Indiv. Defs. Mot. Dismiss at 23–24; Fortinsky Decl., Ex. C.) We are not convinced that the fact that the SEC did not issue a Position Paper clearly denouncing the accounting practice at issue until August 2002 renders the alleged violation immaterial or excusable especially where, as here, the Complaint indicates that Flag's interpretation of the rule was unreasonable. Therefore, since plaintiff has alleged facts indicating that Flag accounted for these transactions using fair value rather than book value, (Complt.¶ 154), plaintiff has adequately alleged a violation of GAAP.

Plaintiffs other allegations of GAAP violations are not pled with the requisite particularity. For example, plaintiff contends that Flag improperly accounted for the sales of indefeasible rights use contracts ("IRU contracts") which are agreements to lease out fiberoptic cables for use over a period of time, typically ten or twenty years. (*Id.* ¶¶ 20–22.) According to plaintiff, Flag was required to recognize revenue over the life of the contract but the company recognized the revenue immediately instead. To support this allegation

plaintiff references the above-mentioned swap transaction between Flag and KPNQwest taking place in March 2001 that apparently involved an exchange of IRU contracts. According to a former Flag Engineer, "Flag immediately booked all the revenues upon the signing of the deal .... However, Flag amortized the cost of fiber over fifteen years." (*Id.* ¶ 131.) This fails to specify the basis of the informant's knowledge and it is not apparent that a Flag engineer would probably possess such knowledge. *See Novak*, 216 F.3d at 314. Therefore, plaintiff has failed to properly allege a GAAP violation in this respect.

Plaintiff alleges that Flag's failure to disclose the details of its non-monetary transactions, including their impact on earnings, was a violation of Statements of Financial Accounting Standards ("SFAS") No. 95, *Statement of Cash Flows.* (Complt.¶¶ 23–29, 67.) According to plaintiff, this provision "requires that information about all investing and financing activities of a company that affect recognized assets or liabilities but that do not result in cash receipts or payments, such as nonmonetary asset exchanges, be disclosed in the footnotes to the financial statements." (*Id.* ¶ 28, citing SFAS No. 95 ¶ 32.) This allegation fails because plaintiff has not alleged that Flag neglected to disclose information about these transactions in its financial statements. The only specific transaction plaintiff claims was never disclosed was a swap transaction with Global Crossing that took place in 2Q:01. (*Id.* ¶ 24.) The Complaint provides details regarding the transaction but there is no explanation as to how plaintiff learned of it.[6] In a separate paragraph in the Complaint plaintiff quotes the following allegation from the complaint in another action

filed by an ex Global Crossing officer: "This was not an IRU sale, but involved a payment of a one year lease capacity in exchange for a prepayment on another one year lease capacity." (*Id.* ¶ 25.) This quotation from the officer's complaint does not identify the transaction referred to as the one alleged by plaintiff in this action. Therefore, plaintiff has failed to "state with particularity all facts on which ... [his] belief is formed." 15 U.S.C. § 78u–4(b)(1). Having failed to allege that a specific transaction was not disclosed as required by SFAS No. 95, plaintiff is left with the bare assertion that "Flag did not disclose the impact on revenues from the swaps or reciprocal transactions until February 13, 2002, the last day of the Class Period ...." (Complt.¶ 29.) This allegation fails because plaintiff has failed to plead facts that demonstrate Flag had a duty to disclose this information prior to its February 2002 statement or that Flag failed to disclose the relevant transactions. Furthermore, when Flag stated that 14% of its GAAP revenues were due to reciprocal transactions, Flag was neither restating revenues nor admitting that it had done anything improper. Plaintiff has failed to plead facts that show the swaps were improper.

Plaintiff next contends that "Flag reported its swaps with KPNQwest and Global Crossing in Europe as Network Services revenues" when they should have been reported as capacity asset sales. (*Id.* ¶ 32.) This would have been misleading because Network Services revenues are typically recurring in nature while capacity asset sales are non-recurring and would have allowed Flag to overstate its Network Services growth in 1Q:01 and 2Q:01. (*Id.* ¶ 149.) This allegedly amounted to a viola-

---

**6.** Plaintiff may be referring to the swap transaction that was described in paragraph 124 of the Complaint. However, there is no indica-

tion in the Complaint that this was the transaction at issue.

tion of Regulation S–K Item 303, (Complt. ¶ 34), which requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues . . . ." 17 C.F.R. § 229.303(a)(3)(ii). According to plaintiff, an unnamed former Flag Senior Vice President of North American Sales indicated that

> the positive results that Flag reported for its Network Services business were possible only because of the reciprocal transactions with KPNQwest and Global Crossing in Europe that defendant McCormack negotiated. The revenues from these reciprocal transactions were reported as network services revenue. Moreover, the KPNQwest and Global Crossing deals were non-recurring in nature and were "certainly not" Network Services deals or revenues.

(*Id.* ¶ 150.) This allegation fails because the plaintiff does not identify the specific transactions to which the Senior Vice President was referring, nor specify when they occurred or the approximate value of the swaps. Without these facts it is impossible to determine whether the transactions at issue had a material affect on earnings during 1Q:01 and 2Q:01 so as to require disclosure under Regulation S–K or to render the statements made concerning Network Services revenues materially misleading.

Finally, plaintiff alleges that Flag failed to timely write-down impairment of its long lived assets and its FA–1 system. (*Id.* ¶¶ 161–70.) According to the Complaint, SFAS No. 121

> requires the reported value of long-lived assets to be assessed whenever certain triggering events occur, including: "(i) a significant decrease in the market value of the asset; (ii) a significant adverse change in legal factors or in the business climate that could affect the value of an

asset or an adverse action or assessment by a regulator; and/or (iii) a current period operating or cash flow losses or a projection or forecast that demonstrates continuing losses associated with an asset used for the purpose of producing revenue."

(*Id.* ¶ 165, quoting SFAS No. 121.) Furthermore, the Complaint alleges that under SFAS No. 5

> an estimated loss from a loss contingency "shall be accrued by a charge to income" if: (i) information available prior to issuance of the financial statements indicated that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements; and (ii) the amount of the loss can be reasonably estimated.

(*Id.* ¶ 168.) According to plaintiff, the $359 million impairment charge Flag took on its FA–1 system should have been written-down prior to February 13, 2002, the date Flag announced the charge to the public. This allegation fails because plaintiff has failed to plead any facts that indicate this impairment charge should have been recognized sooner than it was. *See Acito,* 47 F.3d at 53 ("Mere allegations that statements made in one report should have been made in earlier reports do not make out a claim for securities fraud."); *cf. In re Vivendi Universal, S.A. Sec. Litig.,* No. 02 Civ. 5571 (HB), 2003 WL 22489764, at *12 (S.D.N.Y. Nov.3, 2003) (holding that violation of SFAS No. 121 was properly pled where the write-down took place directly after key management figures left the company, thus giving rise to an inference that it should have been taken earlier). Furthermore, while plaintiff has presented facts that indicate prices fell more than 25% in 2001, (*id.* ¶ 65), plaintiff has failed to plead any facts that show Flag was able to estimate the amount of the write-down prior to its February 2002

statement especially in light of the fact the Flag predicted prices would decline in the Prospectus. (Prospectus at 31.)

### 3. Flag's Statements Concerning Demand and Other Optimistic Statements

Plaintiff has identified statements made between March 2000 and November 2001 in company press releases and SEC filings relating to FY:99, 1Q:00, 2Q:00, 3Q:00, FY:00, 1Q:01, 2Q:01 and 3Q:01. (Complt. ¶¶ 80, 89, 94, 100, 108, 138, 143, 147.)[7] Plaintiff claims that the statements made were misleading because they represented that demand was strong without disclosing the fact that a glut of bandwidth supply was swamping market demand.

Several statements cited by plaintiff amount to direct representations made by Flag that demand for bandwidth was strong. Specifically: (1) in a March 2000 press release Bande stated that a sale of Flag capacity to Saudi Telecommunications Company "underlines the importance of fiberoptic cables in today's bandwidth hungry market," (id. ¶ 81); (2) in an April 26, 2000 press release announcing 1Q:00 results Flag stated "[s]trong global demand for data/IP bandwidth drives cash revenue growth" and that the strength of the results for that quarter "underscores the continuing growth in global demand for higher bandwidth capacity" (id. ¶ 85); (3) in an October 24, 2000, press release Flag attributed its success in 3Q:00 to "a continuing successful execution of the company's strategy to meet the global growth in demand for IP capacity" (id. ¶ 95); (4) in a press release issued on October 30, 2000 Flag announced that "[d]emand for capacity across the Atlantic continues to grow" (id. ¶ 101); (5) in a February 6, 2001 announcement Flag attributed its strong performance in 2000 to "[c]ontinued growth in demand for bandwidth" (id. ¶ 105) and McCormick stated that the company had "seen continued demand for our traditional capacity" (id.); and (6) in a March 5, 2001 press release Flag announced that "in response to market demand [Flag] . . . is bringing forward the planned upgrade program for the . . . [FA–1] system" (id. ¶¶ 112–14). The crux of plaintiff's argument is not that the statements were false. Instead plaintiff asserts that the statements were misleading because "a glut of supply existed that was overwhelming demand and driving

7. Bande, McCormick and Bautista are the only individual defendants to whom plaintiff has directly attributed statements. The Second Circuit adheres to the group pleading doctrine. *DiVittorio v. Equidyne Extractive Indus., Inc.*, 822 F.2d 1242, 1247 (2d Cir. 1987); *Holographics*, 93 F.Supp.2d at 442 ("It is well settled that plaintiffs may engage in so-called group-pleading under 10(b) . . . nothing in the PSLRA has altered that doctrine."). Under this doctrine a plaintiff may "rely on a presumption that statements in 'prospectuses, registration statements, annual reports, press releases, or other group published information,' are the collective work of those individuals with direct involvement in the everyday business of the company." *In re Oxford Health Plans, Inc. Sec. Litig.*, 187 F.R.D. 133, 142 (S.D.N.Y.1999) (quoting *In re Stratosphere Corp. Sec. Litig.*, 1 F.Supp.2d 1096, 1108 (D.Nev.1998)). Plaintiff has not alleged any facts that indicate defendants Suan, McQuaid, Petri or Seskin were involved in the day-to-day operations of Flag. Therefore, the allegedly false statements appearing in the press releases and SEC filings cited by plaintiff cannot be attributed to these directors and the § 10(b) claims against these defendants are dismissed on this alternate ground. The individual defendants also claim that no false or misleading statements can be attributed to Chief Technology Officer Evans because he did not join Flag until January 2002. If this were reflected in the Complaint or any documents incorporated by it, we would certainly agree with the individual defendants. However, they have not directed the Court to any relevant document, much less a document we can consider on a motion to dismiss, that supports this contention.

down prices." (Id. ¶¶ 75, 78, 83, 89, 94, 100, 104, 108, 138, 143, 147.)

Plaintiff also refers to a variety of optimistic statements made by Flag or the individual defendants during the Class Period that he alleges were misleading because of the "glut of supply" that existed. (Id. ¶¶ 82, 85, 91, 92, 101, 102, 105, 135, 136, 141, 144.) For instance: (1) on April 26, 2000 Bande stated "we expect to continue to expand in the Network Services area in parallel with the build-out of our global network infrastructure" (id. ¶ 85); (2) on December 7, 2000 Bande stated that "[t]he competitive landscape on … [the FA–1] route is also encouraging" (id. ¶ 102); (3) on August 7, 2001 in a press release Flag stated that "[t]he market remains very challenging, but we benefit from the global reach of our network," (id. ¶ 141); and (4) on November 6, 2001 Bande stated, "We had a good quarter … Flag Telecom remains a fundamentally sound company. Clearly, our ability to deliver revenue growth and meet our targets in challenging market conditions is a direct result of the competitive advantages and unique reach of our global network … and the high levels of service we are able to provide to those customers …." (Id. ¶ 144.)

While some of plaintiff's allegations tend to demonstrate that the statements made by Flag and the individual defendants were false or misleading, none of plaintiff's allegations demonstrate that Flag or the individual defendants had access to information indicating that the statements were false or misleading when made. See San Leandro Emergency Med. Group Profit Sharing Plan v. Philip Morris, 75 F.3d 801, 812 (2d Cir.1996) (holding that positive statements regarding the company were not actionable where plaintiff failed to allege facts demonstrating that defendants knew the company was in financial trouble when the statements were made).

Therefore, plaintiff has failed to plead that Flag or the individual defendants "knew facts or had access to information suggesting that their public statements were not accurate" as required to establish a strong inference of scienter. Novak, 216 F.3d at 311.

Plaintiff alleges that

[a] former Senior Vice President of Sales in North America revealed that Flag held weekly conference calls in which the Regional Vice Presidents, the Marketing Director, other Marketing personnel, … [including defendant McCormack from time to time], participated. During these conference calls … prospective and pending business … was reviewed. There were also weekly status reports in which business performance was broken down by region, transaction type, product type and service, as well as the outlook going forward. According to the Senior Vice President, the results and outlook contained in these reports was never very good. Indeed, everywhere but Europe and the Middle East was absolutely "terrible," and the U.S.—which was squarely within the "terrible" category—accounted for 2/3 of Flag's revenue targets.

(Complt.¶ 5.) While this allegation may call into question some of the optimistic statements regarding demand and the health of Flag's business, it is far too vague to demonstrate that Flag or the individual defendants had access to information that suggested their public statements were not accurate; merely describing the information received as "terrible" is insufficient to directly contradict the statements cited. The Complaint also does not indicate approximately when these meetings took place, making it impossible to determine whether Flag or the individual defendants

were painting a rosy picture while receiving contrary information.

Plaintiff offers a chart that indicates prices were declining between November 2000 and April 2001. (*Id.* ¶ 65.) This chart does not demonstrate that demand was not as represented or that any of Flag's or the individual defendants' optimistic statements were literally false; prices may fall due to increased competition rather than a reduction in demand and business may still be good. The only relevant statement in the Complaint directly concerning prices is attributed to defendant Bande. On December 7, 2000, he stated, "Market prices appear to have stabilized over the past two quarters and continue to be in line with our expectations." (*Id.* ¶ 102.) This statement is not contradicted by the chart because it does not contain information concerning the quarters Bande was referring to. Plaintiff contends that GTS's press release issued on December 20, 2000 shows Bande's statement was false or misleading. (*Id.* ¶ 103.) Specifically, GTS stated that the telecom industry was experiencing "upheaval in the U.S. and Europe—with bankruptcies, weak results, and precarious financial positions overhanging the group." (*Id.*) While this statement sheds some doubt on Bande's statement regarding prices, GTS made no mention of pricing in the press release. Therefore, there is no indication that Bande had information available that demonstrated prices had not stabilized during the relevant period so even if the statement was misleading plaintiff has not pled facts raising a strong inference of scienter.

Plaintiff alleges that "Flag's former Manager of Market Development for the United States said that Flag's entry into the U.S. market was a failure because there were no new customers interested in purchasing capacity or services from Flag. . . . [B]y the time . . . [the] FA–1 system ·was ready for service, 'nobody

wanted it.'" (*Id.* ¶ 58.) While this allegation calls into question some of Flag's public statements regarding global demand, it does not establish when Flag and the individual defendants became aware of this information. Even if we infer that Flag became aware of this information when the FA–1 system was ready for service, plaintiff does not indicate when that was. Clearly the FA–1 system was not ready for service until after March 2001. As neither Flag nor the individual defendants made any statements containing representations of strong demand after March 2001, this allegation is insufficient to demonstrate Flag or the individual defendants "knew facts or had access to information suggesting that their public statements were not accurate." *Novak*, 216 F.3d at 311.

Plaintiff alleges that "[a] former Flag Regional Marketing Manager . . . said that the sales quota Flag set for his region for 2001 was 'totally unrealistic.'" (Complt. ¶ 59.) This allegation only tends to prove that Flag set the bar too high, not that demand was weak or that the company was headed for dire straits. The Manager goes on to state that "the IP backbone network was 'practically unsellable' because of Flag's lack of development of its network . . . ." (*Id.*) This statement does not refer to demand so it is insufficient to show that the statements cited above concerning demand were false. The allegation does call into question some of the statements concerning Flag's network, but it is impossible from the Complaint to determine when Flag or the individual defendants became aware of this information so plaintiff has failed to show the § 10(b) defendants knew or should have known their public statements were false. Similarly, the Complaint contains statements supported by a former Flag Sales Support Engineer, Manager of Market Development, and Director of Sales that essential-

ly affirm the Marketing Manager's assertions. (*Id.* ¶¶ 60–62.) These allegations fail for the same reason as the allegations supported by the statement of the Marketing Manager.

Plaintiff offers the public statements of Flag's competitors in an effort to demonstrate that Flag knew or had access to facts indicating its public statements were false. (*Id.* ¶ 64.) In June 2001 Level 3 announced "weaker than expected demand from its targeted customer base." (*Id.*) This is insufficient because plaintiff has failed to plead any facts that demonstrate Flag represented after March 2001 that demand was strong. On November 13, 2000 TyCom Ltd. announced that it was experiencing price declines. This allegation fails because it does not refer to demand. Finally, plaintiff again offers GTS's December 20, 2000 press release stating that the telecommunications industry was in "upheaval." This allegation fails because it does not contradict Flag's representations with respect to demand.

Accordingly we conclude that plaintiff has failed to plead facts demonstrating that Flag or the individual defendants knew or should have known the allegedly misleading statements were false or misleading. We also note that Flag's disclosures in the Prospectus present problems for plaintiff. Much of plaintiff's allegations are premised on the assumption that Flag's statements were misleading because Flag failed to disclose "a glut of supply existed that was overwhelming demand and driving down prices." (*Id.* ¶¶ 75, 78, 83, 89, 94, 100, 104, 108, 138, 143, 147.) However, Flag disclosed in great detail the competition it faced from a variety of carriers who were developing systems throughout the world. (Prospectus at 11, 52–53.) Furthermore, Flag disclosed to investors that it expected prices to decline subsequent to its IPO. (*Id.* at 31.) Therefore, many of the misleading statements alleged by plaintiff also fail because they are not material in light of the disclosures made by Flag. *See Olkey*, 98 F.3d at 9.

### 4. *Statements Regarding the Progress of the FA–1 System*

Plaintiff claims that Flag and the individual defendants stated that the FA–1 system project was on schedule when it was not. (*Id.* ¶¶ 90–91, 95, 105, 110–16.) Relatedly, plaintiff claims that Flag caused analysts to make misleading statements relating to Flag's prospects by providing false guidance concerning the FA–1 system. (*Id.* ¶¶ 90, 111.) Plaintiff claims that unnamed defendants announced that the FA–1 system was on schedule at an investor conference on June 7, 2000, when it was not on schedule. (*Id.* ¶ 90.) According to plaintiff, similar guidance led to another positive analyst report on February 7, 2001, and Flag COO McCormack and CFO Bautista represented that the project was on time at a dinner meeting with analysts on February 13, 2001. (*Id.* ¶¶ 109–11.) Another positive analyst report followed this dinner meeting. (*Id.* ¶ 110.) Plaintiff further contends that when Flag finally disclosed on March 5, 2001 that the FA–1 system project was delayed, they did so in a press release that contained actionable misstatements: first, plaintiff claims that Flag's claim that weather in the North Atlantic caused the delay was simply untrue. Second, Flag coupled the negative news with the announcement that Flag was making a capacity upgrade of the system ahead of schedule in such away as to render the press release misleading. (*Id.* ¶ 114.) These allegations fail because plaintiff has not pled facts tending to show that Flag or Bande or McCormack knew or should have known their statements were false when made.

According to plaintiff a Planning Manager who worked on the FA–1 system project "anticipated" as early as March 2000 that the FA–1 system project would be at least three months late. (*Id.* ¶ 112.) The Planning Manager states that his or her Project Manager told the Planning Manager "to alter the bar charts representing the actual construction schedule to reflect the original announced completion date." (*Id.*) These charts were subsequently provided to the bank that was financing the project. (*Id.*) Furthermore, "Flag always posted on its website that FA–1 would be ready by June 30, but that 'they were aware that was not going to happen.'" (*Id.,* quoting the Planning Manager.) This part of the Complaint suffers from two fundamental flaws: first, plaintiff does not plead facts that indicate that Flag or the individual defendants were aware that the FA–1 system was delayed prior to March 2001 when they announced the delay; the mere fact that the Planning Manager "anticipated" a delay in March 2000 does not establish that Flag or the individual defendants had similar foresight. Second, plaintiff has not pleaded any facts that indicate how long the FA–1 system project was delayed or how the market reacted to the news of the delay and plaintiff has therefore not established that the alleged misstatement concerned a material fact.

### B. *Motive and Opportunity*

In the present case, plaintiff has not alleged that any of the individual defendants sold a single share during the Class Period. Instead, plaintiff claims that Flag and the individual defendants possessed the requisite motive and opportunity because: (1) Flag needed cash badly; (2) Flag had to inflate revenues to remain eligible for extensions of credit by Barclays Bank; and (3) the individual defendants received performance-based bonuses. (Pl. Mem. Opp. Indiv. Defs. Mot. Dismiss at 24–27.) These allegations are insufficient to establish a strong inference of scienter based solely on a showing of motive and opportunity.

Motive is established if the plaintiff alleges "concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged." *Novak,* 216 F.3d at 307. "Motives that are generally possessed by most corporate directors and officers do not suffice . . . ." *Kalnit v. Eichler,* 264 F.3d 131, 139 (2d Cir.2001); *See also Chill,* 101 F.3d at 268 (desire to advance "the appearance of corporate profitability, or of the success of the investment"); *San Leandro,* 75 F.3d at 814 (desire to maintain high credit rating); *Acito,* 47 F.3d at 54 (desire to maintain high stock price to increase executive compensation); *Shields,* 25 F.3d at 1130 (desire to prolong benefits of corporate office). Instead, a plaintiff must "allege that defendants benefitted in some concrete and personal way from the purported fraud." *Novak,* 216 F.3d at 307–08.

Plaintiff alleges that Flag had motive and opportunity to commit fraud because Flag needed capital and had to make falsely upbeat statements to raise it. Specifically, plaintiff points to a private placement completed on March 17, 2000 by which Flag raised $576 million. (Complt. ¶ 181.) This allegation is insufficient because plaintiff has not properly pleaded any false or misleading misstatements that took place prior to that time. As discussed above, none of the transactions alleged to be improper swaps took place prior to March 2001. The Complaint also does not plead facts that tend to establish demand was weak until after March 2001; thus, the allegations of misleading statements or omissions pertaining to demand made in connection with this private offering are insufficient. Finally, any alleged misstatements involving the FA–1 system took place after March 2000. Therefore,

absent any misleading statements prior to March 17, 2000, there can be no showing of motive on this point.

Plaintiff next alleges that under the line of credit issued to Flag Limited (Flag's subsidiary) by Barclay's Bank, Flag "could 'not permit the Cumulative Net Revenue for the period from December 31 1997 through ... [January 30, 2005], to be less than' a certain amount calculation pursuant to a formula provided in the agreement." (*Id.* ¶ 182, quoting Credit Agreement.) In order to keep revenues up, plaintiff alleges, Flag engaged in improper swap transactions. (*Id.*) This allegation fails because, as discussed above, plaintiff has failed to plead any facts that demonstrate that Flag inflated revenues by entering into improper reciprocal transactions. *See supra* Part III.A.1. Therefore, plaintiff has failed to allege a misleading statement that benefitted Flag and the individual defendants in some concrete way. This fact distinguishes this present case from *Holographics* which is cited by plaintiff. In *Holographics,* Judge McMahon held that the defendant had the requisite motive because the alleged fraud enhanced the company's ability to raise cash under a credit facility agreement. 93 F.Supp.2d at 445. However, the plaintiff in *Holographics* properly pleaded false statements in the defendant's registration statement. *Id.* at 443–45. Furthermore, the misstatement in *Holographics* allowed the company's IPO to succeed which obviously had a major effect on the defendant's creditworthiness. In the present case, even if plaintiffs had pleaded a misleading statement that enhanced Flag's ability to borrow, it is not clear that Flag needed the revenues from the allegedly improper

swap transactions to remain eligible for credit under the Credit Agreement. Therefore, the conditions in Flag's Credit Agreement do not establish a concrete benefit sufficient to establish a strong inference of scienter based upon a showing of motive and opportunity.[8]

Finally, in his Memorandum of Law plaintiff points to the individual defendants' bonus compensation. This attempt to plead scienter fails for two reasons: (1) no mention of the individual bonuses is made in the Complaint; and (2) the allegations are not sufficiently particular to allow a determination whether the alleged misstatements resulted in bonuses.

### C. *Control Person Liability*

■ Finally, the Complaint includes claims against Verizon and the individual defendants under § 20(a). Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or any rule or regulation thereunder shall also be liable ... to the same extent as such controlled person ... unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). In *Boguslavsky v. Kaplan,* the Second Circuit held that in order to prove a claim under § 20(a) "a plaintiff must show (1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) 'that the controlling person was in some meaningful sense a culpable participant' in

---

**8.** Plaintiff also cites *In re Kidder Peabody Sec. Litig.,* 10 F.Supp.2d 398, 419 (S.D.N.Y.1998) and *In re MicroStrategy Sec. Litig.,* 115 F.Supp.2d 620, 649 (E.D.Va.2000), on this point. These cases are easily distinguishable since the defendants' motive to maintain or enhance a particular line of credit were further evidence that, coupled with other properly pleaded allegations, established a strong inference of scienter. Here, plaintiff has failed to raise an inference of scienter.

the primary violation." 159 F.3d 715, 720 (2d Cir.1998) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1472 (2d Cir. 1996)). Recently, the Second Circuit has noted that "[c]ontrolling-person liability is a form of secondary liability, under which a plaintiff may allege a primary § 10(b) violation by a person controlled by the defendant and culpable participation by the defendant in the perpetration of the fraud." *Suez Equity Investors*, 250 F.3d at 101. Verizon contends that these proclamations firmly establish that a plaintiff must plead "culpable participation" in addition to control of a primary violator in order to state a claim under § 20(a). (Verizon Mem. Supp. Mot. Dismiss at 7.) Accordingly, Verizon urges this Court to abandon its position that there is no such pleading requirement, *see, e.g., Quintel Entm't*, 72 F.Supp.2d at 297–98, and join the courts holding that a plaintiff must plead "culpable participation" in order to state a claim under § 20(a). *See, e.g., In re Deutsche Telekom AG Sec. Litig.*, No. 00 Civ. 9475 SHS, 2002 WL 244597, at *6 (S.D.N.Y. Feb.20, 2002); *In re Livent, Inc. Sec. Litig.*, 78 F.Supp.2d 194, 222 (S.D.N.Y.1999). We conclude that while a plaintiff must include allegations of "culpable participation" to state a claim under § 20(a), pleading control of a defendant that is alleged to be a primary violator generally suffices to establish "culpable participation" within the meaning of that section at the pleading stage.

In *Suez Equity Investors*, one of the cases Verizon claims helped to clarify the pleading standard under § 20(a), the defendant bank invested in a health care financing venture known as the SAM Group. 250 F.3d at 93. The bank then encouraged the plaintiffs to purchase securities issued by the SAM Group. *Id.* Plaintiffs allege that they were deterred from conducting an inquiry into the background of SAM Group's principals because the bank and other defendants objected to the request as costly. Instead, the bank offered to provide the plaintiffs with a copy of the report of the investigation it conducted into the background of the principals. *Id.* However, plaintiffs were provided with a modified version of the report by an officer of the bank that omitted some particularly relevant material. The bank officer was held to be a primary violator of the securities laws. *Id.* at 100–01. The court then held that the plaintiffs adequately pleaded a § 20(a) claim against the bank by alleging that the bank officer was an officer of the defendant bank and that the bank officer was responsible for handling the bank's business relating to the SAM Group. *Id.* at 101.

While the court clearly held that control and a primary violation had been pleaded, the court did not discuss whether plaintiffs had adequately pleaded "culpable participation" on the part of the bank or what the term "culpable participation" means.[9] Courts within this Circuit have recently concluded that the Second Circuit was silent because when a plaintiff pleads control and a primary violation, the plaintiff has pled "culpable participation." *See World-Com*, 294 F.Supp.2d at 414–419 (noting that culpable conduct is a pleading requirement but that the Second Circuit precedents hold that it is satisfied when control and a primary violation are pleaded because "culpable participation" refers merely to the level of control required and

9. Similarly, in *First Jersey*, 101 F.3d at 1472, which involved an appeal of a bench trial, the court stated that "culpable participation" was an element of plaintiff's prima facie case. The court then held that since the plaintiff had established a primary violation and con-trol, the defendant "had the burden of showing that he did not induce the Firm's violations and that he maintained and enforced a reasonable and proper system of supervision and internal control[s] . . . ." *Id.* at 1473.

not to the controlling party's state of mind); *In re Initial Public Offering Sec. Litig.*, 241 F.Supp.2d 281, 308 (S.D.N.Y. 2003) ("whenever the Second Circuit has *applied* its own test, it has essentially rendered the 'culpable participation' requirement meaningless."). Furthermore,

> [t]here is persuasive authority for the proposition that a willful blindness standard applies, that is, that where a control person "knew or should have known that [the] primary violator, over whom the person had control, was engaged in fraudulent conduct, but ... did not take steps to prevent the primary violation," there is culpability in the sense required by [the Second Circuit] ....

*Dietrich v. Bauer*, 126 F.Supp.2d 759, 765–66 (S.D.N.Y.2001) (quoting *Gabriel Capital L.P. v. NatWest Fin., Inc.*, 122 F.Supp.2d 407, 428–29 (S.D.N.Y.2000)). While nothing is clear in this area of § 20(a), it appears that when a plaintiff pleads control over a primary violator the plaintiff has alleged "culpable participation" because a strong inference generally arises that the controlling party should have known that the primary violator was engaged in fraudulent conduct. *See Dietrich*, 126 F.Supp.2d at 766.[10] Nevertheless, allegations of control will not always be sufficient to allege willful blindness, *see Rich v. Maidstone Fin., Inc.*, No. 98 Civ. 2569 (DAB), 2002 WL 31867724, at *12 (mere allegation that the defendant owned 50–75% of the company's shares was not enough to plead "culpable participation"),

so we do not think that the requirement that the plaintiff plead "culpable participation" is meaningless.[11]

■ In the present case, plaintiff has failed to plead a primary violation under the Exchange Act so we need not reach the issue of whether plaintiff has pleaded "culpable participation." Furthermore, plaintiff's allegations fail to demonstrate that Verizon or the individual defendants, with the exception of Bande and McCormack, possessed the degree of control over Flag required by § 20(a). "Control" under this section is defined as "the power to direct or cause the direction of the management and policies of a person, whether through the ownership of voting securities, by contract or otherwise." 17 C.F.R. § 240.12b–2; *First Jersey*, 101 F.3d at 1473. Plaintiff alleges Verizon was a control person because Verizon's predecessor co-founded Flag, Verizon owned almost 30% of Flag's voting stock and Verizon selected three of the nine members of Flag's Board of Directors. They also cite the following statement made by an analyst: "The bond between the two companies is extremely strong, where key strategic decisions are approved by both Verizon and Flag." (Complt.¶ 174.) These allegations are insufficient to establish control within the meaning of § 20(a). While they establish that Verizon had considerable influence over "the direction of the management and policies" of Verizon, they do not create the inference that Verizon could

---

10. When a plaintiff has properly pled control within the meaning of § 20(a) the plaintiff has usually established more. *See Quintel Entm't*, 72 F.Supp.2d at 298 (holding that the plaintiff pleaded control where they pled facts demonstrating the defendants controlled Quintel and the content of the statements plaintiffs alleged were misleading). Similarly, if a plaintiff pleads facts establishing that the control person had motive and opportunity to commit fraud, plaintiff has pled "culpable partic-

ipation." *Suez Equity Investors*, 250 F.3d at 100–01.

11. We note that when the plaintiff has pleaded "culpable participation" the control person may rebut the presumption with a good faith defense at trial or on a motion for summary judgment by demonstrating that he or she "maintained and enforced a reasonable and proper system of supervision and internal control[s]." *Marbury Mgmt., Inc. v. Kohn*, 629 F.2d 705, 716 (2d Cir.1980).

control Flag. *Cf. Dietrich,* 126 F.Supp.2d at 765 (allegations that defendant was the sole shareholder were sufficient to plead control); *Borden, Inc. v. Spoor Behrins Campbell & Young,* 735 F.Supp. 587, 590–91 (S.D.N.Y.1990) (Conner, J.). Allegations of control under this section must be substantial because, as discussed above, § 20(a) imposes liability on a party that is not a primary violator of the Exchange Act unless the control person succeeds with a good faith defense. Therefore, plaintiff must plead additional facts that give rise to the inference that Verizon actually controlled Flag. *In re Blech Sec. Litig.,* 961 F.Supp. 569, 586 (S.D.N.Y.1997) ("Actual control is essential to control person liability."). Plaintiff's allegation that "[b]y reason of their positions as officers and/or directors of Flag, and their ownership of Flag stock, the Individual Defendants had the power and authority to cause Flag to engage in the wrongful conduct," (Complt. ¶ 225), is similarly inadequate. *See Sloane Overseas Fund v. Sapiens Intern. Corp.,* 941 F.Supp. 1369, 1378 (S.D.N.Y.1996) (holding that merely describing a defendant as an officer or director of the company is insufficient to plead control under § 20(a)). However, the allegations of control in the Complaint with respect to McCormack and Bande are sufficient because plaintiff has established that they had significant power within Flag and controlled the content and dissemination of the allegedly false and misleading statements.

### CONCLUSION

For the reasons stated herein, the motions to dismiss pursuant to Rules 12(b)(6) and 9(b) filed by Andres Bande, Larry Bautista, Andrew Evans, Dr. Lim Lek Suan, Edward McCormack, Edward McQuaid, Daniel Petri, Philip Seskin (collectively referred to as the "individual defendants"), Flag, Citigroup and Verizon are granted. Plaintiff's claims against defendants Stuart Rubin, Abdul Latf Ghurab, Adnan Omar, Umberto Silvestri, Jonathan Soloman, Fumio Uehara and Dr. Vilmolvanich Vallobh are also dismissed for lack of personal jurisdiction.

Plaintiff is granted leave to replead his claims. Accordingly, plaintiff has thirty days from the entry of this Opinion and Order to file a Second Consolidated Amended Complaint.

SO ORDERED.